Charles ST. JOHN, Plaintiff,

v.

NCI BUILDING SYSTEMS, INC. and Sirius Solutions, L.L.L.P., Defendants.

Civil Action No. H–06–2281.

United States District Court, S.D. Texas, Houston Division.

Feb. 13, 2008.

Melissa Moore, Moore & Associates, Houston, TX, for Plaintiff.

Thomas Howard Wilson, Sean Michael Becker, Vinson and Elkins LLP, Dean J. Schaner, Haynes & Boone LLP, Houston, TX, for Defendants.

### OPINION & ORDER

MELINDA HARMON, District Judge.

Pending before the court in this disability discrimination and retaliation case are motions for summary judgment filed by Defendants Sirius Solutions, L.L.L.P. ("Sirius") and NCI Building Systems, Inc. ("NCI"). (Docs. 25 & 29, respectively). Plaintiff Charles St. John ("St.John") has filed a response to each motion. (Doc. 33 in response to Doc. 25; Doc. 34 in response to Doc. 29). Both Defendants have replied. (Docs. 35 & 36). Additionally, St. John has filed a surreply to Sirius's reply. (Doc. 37). In consideration of these filings, the record evidence, and all applicable legal standards, as well as for the reasons explained below, the court shall GRANT Defendants' motions.

## I. BACKGROUND & RELEVANT FACTS

St. John was employed by Sirius, a business and technology consulting firm, and worked as a tax consultant on a Sirius project engagement with NCI, a manufacturer of metal building components. On this engagement, St. John was principally in charge of bringing NCI into compliance with the Sarbanes–Oxley Act in the income, franchise, sales, and use tax areas. (See St. John Dep. at 11, Doc. 25 Ex. 1).[1] Leara Higginbotham ("Higginbotham"), also employed at Sirius, was the lead consultant and supervisor on the NCI engagement. (See id. at 12, 36–37; Higginbotham Dep. at 50–51, Doc. 25 Ex. 5).

This was not the first time that either St. John or Higginbotham had worked with NCI or each other. In 2004, the tax manager at NCI became terminally ill, which prompted NCI to contract with Jefferson Wells International, Inc. ("Jefferson Wells") for assistance with its tax operations. (Lawrence Dep. at 16, Doc. 25 Ex. 7). At that time, both St. John and Higginbotham were employed as consultants by Jefferson Wells. Jefferson Wells initially assigned Higginbotham to NCI, and Higginbotham asked St. John to join her. (Id. at 17; Higginbotham Dep. at 32–33, Doc. 25 Ex. 5). Higginbotham and St. John had also worked together for several other employers and had been good friends for about ten years. (St. John Dep. at 103, Doc. 25 Ex. 1; Higginbotham Dep. at 29–30, 100–01, 221–22, Doc. 25 Ex. 5).

In January 2005, St. John and Higginbotham resigned from Jefferson Wells. (See St. John Resignation, Doc. 29 Ex. F; Higginbotham Dep. at 36–37, Doc. 25 Ex. 5). Although both left Jefferson Wells under the impression that they would become employees of NCI, a hiring freeze instituted by NCI's newly-hired Chief Financial Officer, Francis Powell ("Powell"), precluded employment for St. John and Higginbotham at NCI. Nevertheless, Bill Lawrence ("Lawrence"), NCI's Corporate Controller, wanted both

---

1. Because substantial overlap exists among the exhibits filed by the parties, the court cites to exhibits by their earliest entry in the docket.

to continue with the NCI engagement, and so, the parties discussed various employment alternatives. (*See* Lawrence Dep. at 19–20, Doc. 33 Ex. 1). Higginbotham arrived at an adequate solution when she approached Kristi Chickering ("Chickering"), a managing partner at Sirius, about Sirius hiring her and St. John to work on the NCI engagement. (St. John Dep. at 19–22, Doc. 25 Ex. 1; Higginbotham Dep. at 41–43, Doc. 25 Ex. 5). Chickering agreed to the arrangement, and Sirius offered Higginbotham and St. John positions as tax consultants effective in late February 2005. (Chickering Decl. ¶ 5, Doc. 25 Ex. 2). Thereafter, Sirius and NCI formalized the arrangement in an Engagement Agreement whereby Sirius, through Higginbotham, St. John, and other consultants, would provide tax services to NCI on site. (*See* Engagement Agreement, dated Feb. 22, 2005, Doc. 25 Ex. 4). It was on Higginbotham's recommendation that Sirius hired St. John. (Chickering Dep. at 30–31, Doc. 29 Ex. I).

St. John worked on the NCI engagement on behalf of Sirius from February 2005 to May 2005. During that time, NCI asserts that it was consistently disappointed with St. John's work performance. The placement agreement between Sirius and NCI required St. John to work a minimum of 32 hours per week on the engagement. In March 2005, St. John billed an inordinate amount of time to "General and Administrative" ("G & A") duties, for which NCI did not like to pay without more specificity. (*See* Higginbotham Dep. at 82–88, 126–27, 235–40, Doc. 25 Ex. 5; May 9, 2005 Higginbotham Email to St. John, Doc. 25 Ex. 13). Additionally, St. John failed to complete certain high priority assignments, such as a "state nexus study" through which he was to determine NCI's tax liability in certain states. (*See* Lawrence Dep. at 35, 38–41, Doc. 25 Ex. 7). Other incomplete assignments included researching and reporting the sales and use tax status of an NCI-affiliated entity (*id.* at 72, 75–76), providing information to the state auditor about an unclaimed property issue (*id.* at 35–36, 43–45), establishing accruals for the franchise tax calculations of certain NCI affiliates (St. John Dep. at 50–51, Doc. 25 Ex. 1), and automating NCI's tax calendar by March 24, 2005 (*See* Higginbotham Dep. at 73, Doc. 25 Ex. 5; *see also* Weekly Status Report at SS 1704, Doc. 29 Ex. M). Finally, St. John caused concern when, on April 12, he lost his temper with Higginbotham, shouted at her loudly enough so that NCI employees working in the vicinity could hear him, and stormed out of the office. (Higginbotham Dep. at 151–52, 247–48, Doc. 25 Ex. 5). St. John acknowledged that he "completely lost his cool" during the incident. (*See* April 27, 2005 St. John Email to Chickering, Doc. 25 Ex. 20).

A part of the tension between St. John and Higginbotham stemmed from Higginbotham's alleged disclosure of St. John's confidential health and personal information to NCI personnel.[2] St. John had been diagnosed in 2002 as positive for Human Immunodeficiency Virus ("HIV"), the virus that causes Acquired Immune Deficiency Syndrome ("AIDS"). (St. John Dep. at 65, Doc. 25 Ex. 1). St. John also claims to be a recovering alcoholic and member of Alcoholics Anonymous ("AA"). (*Id.* at 85–87). He identifies himself as a homosexual. (*Id.* at 67–68). Since his divorce in 1985, St. John has had no plans to remarry or have additional children. (*Id.* at 7–8). Higginbotham was aware of St. John's HIV-positive status and his status

**2.** The main source of tension between the two was St. John's resentment of Higginbotham's supervisory role on the NCI engagement.

as a recovering alcoholic. (Higginbotham Dep. at 101, 104, Doc. 25 Ex. 5) She was also aware of his sexual orientation. (*Id.* at 100). On April 1, 2005, Higginbotham disclosed to Lawrence during a lunch conversation that St. John was homosexual. (*Id.* at 96–101). On that same day, Higginbotham told St. John that she had discussed his sexual orientation with Lawrence and that Lawrence did not have a problem with St. John's sexual orientation. (*Id.* at 96; St. John Dep. at 178, Doc. 25 Ex. 1). Higginbotham viewed Lawrence's response as positive, but St. John felt differently. Thus, the next evening, St. John sent Higginbotham a personal email in which he informed Higginbotham that he was upset with her disclosure of his sexual orientation to Lawrence. (April 2, 2005 Email String between St. John and Higginbotham ("April 2 Email"), Doc. 25 Ex. 14). St. John also expressed his displeasure over her disclosure of St. John's sexual orientation to another NCI employee, Bobbie Temres ("Temres"), which had occurred sometime before Higginbotham's conversation with Lawrence.[3] (*Id.*). Finally, St. John chastised Higginbotham for discussing their membership in Alcoholics Anonymous and asked that she "refrain from including [him] in references to any 'program.'" (*Id.*).

Higginbotham responded to St. John's email promptly and with sincere regret for having caused St. John any pain. (*Id.*). She acknowledged that she was wrong in having disclosed personal information about St. John to their client. (*Id.*). Higginbotham also apologized to St. John for referencing the "program" in Law-

rence's presence on another occasion and that she would not speak so openly in the future. (*Id.*). After discussing some of the tensions at work, Higginbotham concluded by asking once more for St. John's forgiveness. (*Id.*).

On April 5, St. John responded to Higginbotham's apology and explained that he "was neither hurt nor ... angry" and that "forgiveness is a given, although not necessary here" because she was his friend and he loved her. (April 5, 2005 St. John Email to Higginbotham ("April 5 Email"), Doc. 25 Ex. 15). At that time, St. John did not notify Sirius of any concern over the disclosure of his personal information.

St. John's behavior and performance problems persisted throughout April 2005. With the impetus of the April 12 blowup, Lawrence requested that Higginbotham involve Chickering on the matter. As a result, Chickering, Higginbotham, and St. John discussed St. John's behavior and performance problems in a teleconference on April 27, 2005. (Chickering Decl. ¶¶ 11–14, Doc. 25 Ex. 2). Shortly before the meeting, Higginbotham warned Chickering that St. John had been acting irrationally and that Higginbotham suspected drug use (*see* April 26 and 27, 2005 Higginbotham emails to Chickering, Doc. 33 Exs. 11 & 12). The teleconference, however, proceeded without incident. After the conference call, Chickering received two emails from St. John in quick succession. (Chickering Decl. ¶ 15, Doc. 25 Ex. 2). The first email offered his rebuttal to some of the issues raised dur-

---

**3.** St. John also alleges that in April 2005, Higginbotham disclosed his HIV-positive status to Temres. Both Higginbotham and Temres deny any such disclosure. Temres claims that St. John had indirectly disclosed his HIV positive status to Temres when St. John mentioned that he could not join a certain diet plan because of his "status." (Temres Decl.

¶ 3, Doc. 25 Ex. 16). Temres assumed that St. John was referring to his HIV status because Temres has a son who is HIV positive. (*Id.*). Higginbotham did admit, however, to disclosing St. John's sexual orientation to Temres. (Higginbotham Dep. at 119–120, Doc. 25 Ex. 5).

ing the teleconference, such as the completion of the tax calendar and the G & A billing. (April 27, 2005 St. John Email to Chickering, Doc. 25 Ex. 20). The email also briefly mentioned that Higginbotham had disclosed "extremely personal aspects of [his] life, including health issues," to NCI employees, which St. John alleged had "created a hostile environment for [him] to work in at NCI." (*Id.*). In the second email, sent the following day, St. John informed Chickering that he had a "nice discussion" with Higginbotham and that he may have "overreacted" in his April 27 email. (April 28, 2005 St. John Email to Chickering, Doc. 25 Ex. 32). He expressed that he wanted to "see how things go," and he thought it would be "ok." (*Id.*). After reviewing the two emails, Chickering considered the issues with Higginbotham to be closed and did not interpret the emails as asserting any kind of complaint about discrimination or harassment. (Chickering Decl. ¶ 15, Doc. 25 Ex. 2).

In addition to the teleconference, Sirius took additional steps to help St. John succeed with the NCI engagement. St. John asked for a separate office, and Higginbotham granted his request. (*See* St. John Dep. at 108–109, Doc. 25 Ex. 1). Higginbotham also offered guidance on the prioritization of projects in an effort to help St. John complete his assignments. (*Id.* at 197; Higginbotham Dep. at 259–60, Doc. 25 Ex. 5). Additionally, Sirius hired another tax consultant, Glen Singleton ("Singleton"), in late April 2005 to assist St. John on the NCI engagement. (Higginbotham Dep. at 176–77, 260–61, Doc. 25 Ex. 5). Sirius's position is that it hired Singleton to help not replace St. John. (*Id.*). Finally, to address the G & A issues, Chickering implemented a policy whereby Higginbotham would approve all Sirius employees' time sheets. (*See id.* at 83–87; *see also* May 3, 2005 Chickering Email, Doc. 25 Ex. 38). Despite these measures, St. John continued to miss deadlines and struggle with Higginbotham's authority.

On May 9, 2005, St. John sent an email to Jamie Daughtry ("Daughtry"), Sirius's Human Resource Generalist at the time, regarding the April 2 incident where Higginbotham disclosed St. John's sexual orientation to Lawrence. (May 9, 2005 St. John Email to Daughtry, Doc. 25 Ex. 41). In this email, St. John alleged for the first time that Higginbotham had disclosed not only his sexual orientation and AA membership but also his HIV-positive status to Lawrence and other NCI employees. (*See id.*). Daughtry investigated immediately and called Higginbotham. (Daughtry Decl. ¶ 5, Doc. 25 Ex. 9). Higginbotham denied that she disclosed any information about St. John's HIV status, but she admitted that she discussed St. John's sexual orientation and AA membership with an NCI employee. (*Id.*). Higginbotham also forwarded the April 2 and 5 emails to Daughtry in which Higginbotham and St. John had discussed the disclosure of his personal information. (*Id.* ¶ 6). Based on Higginbotham's admission regarding the disclosure of St. John's sexual orientation and AA status, Daughtry verbally counseled Higginbotham never to disclose that kind of information again and instructed her to read and acknowledge that she understood Sirius's anti-harassment policy. (*Id.*). Higginbotham signed and acknowledged the policy by email, and Daughtry placed the email acknowledgment in Higginbotham's personnel file. (*Id.*). On May 10, 2005, Daughtry informed St. John that the situation had been addressed and that he should contact her if any of the issues re-occurred. (*Id.* ¶ 7). St. John thanked Daughtry for her response. (*See* May 10, 2005 St. John Email to Daughtry, Doc. 25 Ex. 46). St. John never informed Daughtry that he was unsatisfied or that he wanted Sirius to take additional action

against Higginbotham. (Daughtry Decl. ¶ 7, Doc. 25 Ex. 9).

Weary of St. John's inability to meet deadlines and his continued power struggles with Higginbotham, Powell told Chickering on May 12, 2005, to remove St. John from the NCI engagement. (*See* Powell Dep. at 62–64, 80–81, Doc. 25 Ex. 3). In addition to Powell's displeasure with St. John's work product and behavior, NCI had also decided to hire in-house employees for the tax department. (*Id.* at 84–85; Chickering Decl. ¶ 20, Doc. 25 Ex. 2).[4] At no point before St. John's removal did Powell have any knowledge of St. John's HIV status, AA status, or any complaints St. John had made about the disclosure of certain personal information. (Powell Dep. at 74–78, Doc. 25 Ex. 3).

On May 13, 2005, Chickering informed St. John that he had been taken off the NCI engagement. (St. John Dep. at 100–101, Doc. 25 Ex. 1). Chickering did not have knowledge of St. John's status as HIV positive or as a recovering alcoholic when she informed him of NCI's decision. (Chickering Decl. ¶ 17, Doc. 25 Ex. 2). Nor was Chickering aware that St. John had made any complaint about Higginbotham or any other Sirius employee about alleged discrimination or harassment concerning his HIV-positive status and AA status. (*Id.*).

Despite his removal on the NCI project, St. John remained employed by Sirius, and Sirius attempted to find St. John other engagements. (*See id.* ¶ 22). Chickering offered St. John an assignment with Reliant Energy, but St. John turned down the offer because it would have required him to work more than fifty hours per week. (*Id.*; St. John Dep. at 32, 214, 261, Doc. 25 Ex. 1). St. John was physically capable of

working overtime, but chose not to do so. (St. John Dep. at 32, 92, Doc. 25 Ex. 1).

St. John filed for unemployment on May 22, 2005. (Unemployment App., Doc. 25 49). The Texas Work Force Commission ("TWC") contacted Daughtry regarding St. John's claim and, on June 6, 2005, Daughtry informed the TWC that St. John's employment had not been terminated and that "[Sirius] would put him on another assignment immediately if [it] had something available that fits his qualifications." (June 6, 2005, Daughtry Correspondence to TWC, Doc. 25 Ex. 50). On June 13, 2005, Sirius did send St. John a Mutual Separation Agreement and Release that would have ended St. John's employment, but St. John refused to sign the release. (Daughtry Decl. ¶¶ 11–12, Doc. 25 Ex. 9). Thereafter, Sirius sent St. John a letter notifying him that he was still a Sirius employee and that Sirius would offer him new placement opportunities as they became available. (August 1, 2005 Sirius Letter to St. John, Doc. 25 Ex. 52).

St. John left Sirius in August 2005 when he accepted a job as a state tax manager for Eagle Global Logistics. (St. John Dep. at 217, Doc. 25 Ex. 1). Until that time, Sirius continued to search for placements for St. John with its clients. (*See* Chickering Dep. at 142, Doc. 33 Ex. 4). To date, St. John remains "active" in Sirius's database, which means that he is eligible to be placed on engagements with Sirius's clients. (Chickering Decl. ¶ 22, Doc. 25 Ex. 2).

During his brief tenure with Sirius, St. John did not experience any HIV-related physical or mental limitations. (St. John Dep. at 74, 78–83, Doc. 25 Ex. 1). At the time, he was asymptomatic, and medications helped him to live, work, and per-

---

4. Indeed, NCI eventually asked Sirius to stop providing tax services and all Sirius employees who had been assigned to NCI's tax department, including Higginbotham and Singleton, were removed from the NCI engagement.

form his daily activities without any HIV-related physical or mental limitations. (*Id.* at 74, 82–83). Nor did he experience any physical or mental limitations due to his status as a recovering alcoholic. (*Id.* at 77–79, 146).

On July 7, 2006, St. John filed the current suit against both Sirius and NCI. He has brought claims for employment discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[5] Sirius and NCI have moved for summary judgment on all of St. John's ADA claims.

## II. LEGAL STANDARDS

### A. *Summary Judgment Standard*

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hart v. Hairston,* 343 F.3d 762, 764 (5th Cir.2003). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir.2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.

*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

Once the movant meets its burden, however, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also DIRECTV Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir.2005). To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A.,* 139 F.3d 532, 536 (5th Cir.1998). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998) (citing *Skotak v. Tenneco Resins,*

---

**5.** Plaintiff initially brought a hostile work environment claim against both Defendants, but has decided not to pursue that claim. (*See*

Pl.'s Resp.at 39, Doc. 33; Pl.'s Resp. at 45, Doc. 34).

*Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.1992)).

Nevertheless, all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita*, 475 U.S. at 587–88, 106 S.Ct. 1348; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir.2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact extant in the summary judgment evidence produced by the moving party. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 198–200 (5th Cir.1988). The non-moving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). In reviewing evidence favorable to the party opposing a motion for summary judgment, a court should be more lenient in allowing evidence that is admissible, though it may not be in admissible form. *See Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir. 1988).

### B. *The McDonnell Douglas Framework*

 This is a case of disability discrimination based solely on circumstantial evidence.[6] As such, St. John's claims are governed by the tripartite burden-shifting scheme established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See McInnis v. Alamo Cmty Coll. Dist.*, 207 F.3d 276, 279 (5th Cir.2000) (applying the *McDonnell Douglas* framework to a case brought under the ADA). Under the *McDonnell Douglas* test, if St. John establishes a *pri-*

*ma facie* case of discrimination, a presumption of discrimination arises, and the burden shifts to the Defendants to articulate a legitimate, non-discriminatory reason for their employment action. *See Price v. Federal Express Corp.*, 283 F.3d 715, 720 (5th Cir.2002). Defendants' burden is satisfied if they produce evidence, which "*taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Id.* (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original). If Defendants satisfy this burden and articulate a reason that can support a finding that their actions were nondiscriminatory, then "the mandatory inference of discrimination created by the plaintiff's *prima facie* case drops out." *Id.* (citing *Hicks,* 509 U.S. at 510–511, 113 S.Ct. 2742). St. John must then introduce evidence creating a jury question as to whether the Defendants were motivated by discriminatory animus. Plaintiff meets this burden by showing either (1) that a defendant's articulated reason was pretextual (pretext alternative), or (2) that plaintiff's protected characteristic was a motivating factor in the decision (mixed motives alternative). *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004). In determining whether summary judgment is appropriate, courts should consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

---

**6.** St. John does not allege, nor does the record support, that direct evidence of discrimination exists in this case.

## III. DISCUSSION

### A. *St. John's Standing to Sue NCI*

■ A claim under the ADA must necessarily involve an employment relationship. *See* 42 U.S.C. §§ 12111(2) & 12112(a) (ADA provisions making it unlawful for an "employer" to discriminate); *Bloom v. Bexar County*, 130 F.3d 722, 724 (5th Cir.1997) (finding that the defendant was not a "covered entity" under the ADA because it was not the plaintiff's employer). Thus, a threshold issue to be determined by the court is whether NCI was St. John's employer.

■ The Fifth Circuit applies a "hybrid" economic realities/common law control test to determine if an employment relationship exists under employment discrimination statutes. *See Deal v. State Farm County Mut. Ins. Co. of Tex.*, 5 F.3d 117, 118–19 (5th Cir.1993) (applying hybrid economic realities/common law control test to determine whether employment relationship existed under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*); *Mares v. Marsh*, 777 F.2d 1066, 1067–68 (5th Cir.1985) (applying test to a Title VII case). Given the substantial overlap in the analytical framework among the employment discrimination statutes, the court finds that the hybrid economic realities/common law control test applies in determining whether an employment relationship exists under the ADA.

■ In applying the hybrid economic realities/common law control test, the most important consideration is the right to control an employee's conduct. *Deal*, 5 F.3d at 119. This control element focuses on whether an entity "has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule." *Id.* The economic realities component focuses on whether an entity "paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id.*

■ Here, the court finds that NCI did not exercise the requisite control over St. John's employment to be considered an employer under the hybrid economic realities/common law control test. NCI hired Sirius for consulting work, and it is undisputed that St. John worked directly for Sirius. NCI did not hire St. John. Nor did NCI "fire" St. John from Sirius when it asked that he be removed from the NCI engagement. St. John continued to work for Sirius, who offered him other placements. Indeed, St. John remains listed as "active" on Sirius's network. (Daughtry Dep. at 95, Doc. 29, Ex. K). Moreover, NCI did not "supervise" St. John. At all relevant times, St. John reported to, and was supervised by, Higginbotham, a Sirius employee, and when NCI was dissatisfied with St. John's behavior and performance, it relied on Sirius personnel to address those issues. Additionally, NCI did not exercise control over St. John's work schedule. St. John set his own schedule, working only 32 hours per week as the parties had agreed. With respect to the economic realities component, it is undisputed that NCI did not pay St. John's salary, withhold taxes on his behalf, or provide him benefits. (Powell Dep. at 90–91, Doc. 29 Ex. A). NCI did not "set the terms and conditions" of St. John's employment. St. John's employment was governed by Sirius's employee handbook and Sirius's work policies. (*See* St. John Dep. at 157–59, Doc. 25 Ex. 1). When St. John had employment-related complaints, he approached Sirius, not NCI. (*Id.*). Taken as a whole, these undisputed facts overwhelming demonstrate that NCI did not exercise the requisite control to be considered St. John's employer.

■ St. John argues that NCI exercised "complete control" over his employment because (1) NCI and Sirius had entered into an engagement agreement in which NCI retained the responsibility to request the "nature, scope and design of services" to be performed, make "decisions regarding the accounting treatment of any item included in [its] tax calculations," and review and approve Sirius's billing for the services provided under the agreement (Engagement Agreement, Doc. 33 Ex. 5), and (2) NCI requested status updates about St. John's work. The court disagrees that a client company's reservation of rights to ensure the accuracy of its tax reporting and to review its relationship with a service provider evidences "complete control" over a tax consultant independently employed by that service provider. St. John has failed to provide evidence that NCI had any meaningful right to control his conduct. *See Barrow v. New Orleans Steamship Ass'n,* 10 F.3d 292, 296 (5th Cir.1994) (organization that "had no meaningful right to control [plaintiff's] conduct" was not an employer when another company "had the right to hire and fire [him], to supervise him, and to set his work schedule" and when the plaintiff had "produced no evidence that [defendant] paid his wages, withheld his taxes, provided benefits to him, or set the terms and conditions of his employment."); *see also Reith v. TXU Corp.,* No. 4:05CV33,

2006 WL 887413, at *4 (E.D.Tex. April 4, 2006) (finding that plaintiff was an employee of a staffing agency and not of the defendant that contracted with that agency when the agency paid plaintiff's salary, withheld taxes on his behalf, provided him benefits, and retained the power to hire, fire, and promote him).[7] As such, the court concludes that NCI was not St. John's employer and that St. John lacks standing under the ADA to bring suit against NCI.

Even if a fact question remained concerning NCI's status as St. John's alleged employer, the remaining analysis makes clear that St. John's disability discrimination and retaliation claims against both Defendants fail as a matter of law. The court therefore assumes, *arguendo,* that NCI and Sirius were both covered employers for the analysis that follows.

**B.** *St. John's Disability Discrimination Claim*

■ Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is

---

7. St. John's reliance on *McCracken v. Exxon Mobil Corp., Inc.,* No. Civ. A. H–03–5726, 2006 WL 456252 (S.D.Tex. Feb.23, 2006), which found a feet question on the issue of control, is misplaced. In *McCracken,* unlike here, the agency employee ("McCracken") lodged repeated complaints of harassment directly with ExxonMobil, the company to which he provided services. *See id.* at *4–9. The plaintiff in *McCracken* also presented evidence that ExxonMobil provided his training, day-to-day supervision, and set his work schedule, *id.* at *9, which St. John has failed to do in the present case. Moreover, Exxon-

Mobil fully reimbursed the agency that paid McCracken's salary, evaluated his job performance, sent him memoranda, approved the salary and the raises he received, and conducted the investigation that lead to McCracken's termination by the agency. *Id.* Finally, ExxonMobil dictated the job functions performed by McCracken's co-workers, selected the supervisors, and required every worker to comply with ExxonMobil's policies. *Id.* None of these evidences of control are present here. Thus, *McCracken* is distinguishable.

one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). To establish a *prima facie* case of disability discrimination, St. John must show (1) he is disabled within the meaning of the ADA; (2) he is qualified for the job; (3) he was subject to an adverse employment action; and (4) he was replaced by or treated less favorably than non-disabled employees. *See Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir.2003) (citing *McInnis*, 207 F.3d at 279–80); *see also Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir.1995).

The court finds that St. John has failed to establish a *prima facie* case of disability discrimination because he was not disabled within the meaning of the ADA. Under the ADA, the term "disability" is defined in three ways:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2)(A)-(C). St. John argues that he qualifies as disabled under the first and third statutory definitions. The court addresses each in turn.

1. Physical or mental impairment that substantially limits one or more major life activities

▮▮▮ Neither alcoholism nor an HIV diagnosis is a *per se* disability under the ADA. *Burch v. Coca–Cola Co.*, 119 F.3d 305, 315–316 (5th Cir.1997) (recovering alcoholic); *Blanks v. Southwestern Communs., Inc.*, 310 F.3d 398, 400–01 (5th Cir.2002) (HIV status).[8] Rather, St. John must demonstrate that he suffers from an impairment that "substantially limited" him in a "major life activity." *See Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 197–98, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (emphasizing that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled" and that "the ADA requires those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience is substantial") (internal citation omitted). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995) (quoting 29 C.F.R. § 1630.2(i)). A "substantial limitation" means that an individual is (1) "unable to perform a major life activity that the average person in the general population can perform," or (2) "significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Id.* at 726 n. 8 (quoting 29 C.F.R. § 1630.2(j)(1)(i), (ii)).[9]

---

8. St. John's argument to the court that his HIV-positive status is a *per se* disability under the ADA has been foreclosed by Fifth Circuit precedent.

9. A physical or mental impairment is defined as:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h)(1), (2); *see also Dutcher*, 53 F.3d at 726 n. 5.

"Whether an impairment substantially limits a major life activity is determined in light of (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its permanent or expected permanent or long-term impact." *Id.* at 726.

■ The undisputed evidence establishes that St. John did not experience any HIV or alcoholism-related impairments that substantially limited him in a major life activity. St. John has not identified with particularity any major life activity that was limited by his status as either HIV positive or as a recovering alcoholic.[10] With respect to his diagnosis as HIV positive, St. John concedes that he was asymptomatic at all times and that his medications mitigated the effects of the disease. As such, St. John has not established that his HIV-positive status "substantially limited" him in a "major life activity." *See Sutton v. United Air Lines,* 527 U.S. 471, 482–83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limit' a major life activity."). Regarding his status as a recovering alcoholic, St. John has not identified or offered evidence of a single activity that was affected by his past alcohol abuse. Indeed, St. John does not argue that his alleged AA/recovering alcoholic impairment was an actual disability during his Sirius employment. Having failed to establish, or even argue, that his status as HIV positive or as a recovering

alcoholic substantially limited him in any major life activity, St. John did not have an actual disability under the ADA.

2. Being "regarded as" having an impairment

■ An individual may be "regarded as" disabled if he "(1) has an impairment which is not substantially limiting but which the employer perceives as ... substantially limiting ...; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment." *Bridges v. City of Bossier,* 92 F.3d 329, 332 (5th Cir.1996); *see also Pegram v. Honeywell, Inc.,* 361 F.3d 272, 287 (5th Cir.2004) (explaining that one is regarded as disabled "if the employer mistakenly believes that: (1) the individual has a physical impairment that is substantially limiting; or (2) an actual, but not-limiting impairment is substantially limiting"). "Under the 'regarded as' prong, the disability status of the plaintiff turns not on the plaintiff's physical condition, but rather on how the plaintiff was perceived and treated by those alleged to have taken discriminatory action." *Deas v. River West, L.P.,* 152 F.3d 471, 476 n. 9 (5th Cir.1998).

■ Here, St. John contends that Sirius and NCI perceived him as substantially limited in his ability to work because of his HIV-positive status, his AA status, and because Higginbotham suggested to Chickering, shortly before the April 27, 2005 teleconference, that St. John was engaging in drug use. "For an employer to regard an impairment as substantially lim-

---

**10.** St. John makes a brief reference in his response that his HIV-positive status substantially limited his "major life activity" of a regularly-functioning lymphatic system. A lymphatic system is not a major life activity. St. John mistakenly conflates the definitions of "physical impairment" and "major life activity."

iting [the major life activity of] work, the employer must regard an individual as significantly restricted in his ability to perform a class or broad range of jobs." *Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1051–52 (5th Cir.1998). The record is devoid of any evidence to suggest that either NCI or Sirius regarded St. John as significantly restricted in any way, let alone in his ability to perform a class or broad range of jobs. Indeed, St. John admitted in his deposition testimony that he had no such evidence against NCI:

Q.: Do you believe you were perceived as disabled by anyone at NCI?

A.: I don't know.

Q.: Do you have any evidence that you were perceived as disabled by anyone at NCI?

A.: I don't have any evidence, no.

(St. John Dep. at 240–41, Doc. 25 Ex. 1). Powell, NCI's CFO who requested St. John's reassignment, was completely unaware of his HIV-positive status, AA status, or alleged drug use.[11] Even if Powell had such knowledge, the mere fact that an employer was aware of an employee's impairment does not, standing alone, lead to the conclusion that the employer regarded the employee as disabled. *See Gaston v. Jack Post Corp.*, 971 F.Supp. 1084, 1087–88 (N.D.Miss.1997). Sirius, for its part, did not view St. John as limited in his ability to perform a class or broad range of jobs. It did not terminate St. John's employment after his removal from the NCI engagement and, instead, sought alternate placements for St. John. Thus, all that remains are St. John's speculative and conclusory allegations that NCI and Sirius perceived him as substantially limited, allegations that are belied by the uncontested evidence in this case.

For these reasons, the court finds that St. John was not "disabled" within the meaning of the ADA. As such, St. John has failed to prove an essential element of his *prima facie* case of disability discrimination, and summary judgment on this basis alone is appropriate. Even assuming *arguendo* that St. John had established a *prima facie* case, he has failed to present any evidence that his removal from the NCI engagement was either a pretext for or motivated by discrimination.[12] Accordingly, St. John's claim of disability discrimination against Sirius and NCI fails as a matter of law.

### C. *St. John's Claim of Retaliation*

▄ The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). The familiar burden-shifting *McDonnell Douglas v. Green* framework applies in unlawful retaliation cases, *see Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir.1998); therefore, St. John must first establish a *prima facie* case of retaliation. To do so, St. John must prove that (1) he engaged in an activity protected by the ADA; (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse em-

---

**11.** The record before the court supports the conclusion that Higginbotham never revealed St. John's HIV-positive status to anyone at NCI and the only individual at NCI who was aware of his diagnosis was a non-supervisory employee who played no role in Powell's reassignment request.

**12.** The court finds that the Defendants have met their burden of production in articulating a legitimate, nondiscriminatory reason for their actions.

ployment action. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir.1999). St. John relies on his complaints to Sirius regarding Higginbotham's disclosure of his personal information as activities protected by the ADA. He cites his removal from the NCI engagement as the adverse employment action.[13] Finally, St. John claims that (1) the alleged discriminatory influence of Higginbotham on Powell, the NCI decisionmaker and (2) the temporal proximity between his complaints and his removal satisfy the causal connection. Assuming *arguendo* that St. John suffered an adverse employment action, the court nevertheless finds that St. John has failed to establish that he either engaged in an activity protected by the ADA or that a causal connection exists between his complaints and his removal from the NCI engagement.

1. St. John did not engage in an ADA "protected activity."

▆▆▆▆ To establish that he engaged in a protected activity, St. John must demonstrate that he had a "reasonable belief that his employer was engaged in unlawful employment practices." *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir.2007) (quoting *Byers v. Dallas Morning News*, 209 F.3d 419, 428 (5th Cir.2000)).[14] As evidence of his reasonable belief that Sirius had engaged in unlawful employment practice, St. John relies on (1) his April 27, 2005, email to Chickering in which he complained that Higginbotham had disclosed unspecified "health issues," and (2) his May 9, 2005, email to Daughtry concerning Higginbotham's alleged disclosures. The April 27 email, by St. John's own admission, was not a complaint of discrimination or harassment. (St. John Dep. at 194–95, Doc. 25 Ex. 1). The email only references vague "health issues" and does not refer to any physical or mental restrictions St. John supposedly suffered. (*Id.*). Likewise, his May 9 email to Daughtry does not complain about discrimination (treated less favorably than similarly situated employees) or a refusal to accommodate his

---

**13.** St. John also invokes Sirius's alleged failure to find him another engagement after the NCI engagement ended and his alleged termination from Sirius as adverse employment actions. St. John stated in his deposition testimony, however, that his removal from the NCI engagement was the only adverse employment action he was relying on to support his claim. (St. John Dep. at 97–99, Doc. 25 Ex. 1). Furthermore, the uncontested documentary and testimonial evidence reveals that Sirius did not take any actions to adversely affect his employment status after NCI removed him from the project on May 13, 2005. Sirius offered to place St. John on another engagement, but he declined the offer. Additionally, Sirius continued to search for placements for St. John, and even after St. John accepted a position with Eagle Global Logistics, he remained active in Sirius's database. Sirius's "actions" do not constitute adverse employment actions under the facts of this case. *See Burlington Northern & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2409, 165 L.Ed.2d 345 (2006) (holding that any employer action that would be "materially adverse to a reasonable employee or job applicant" satisfies the "adverse employment action" requirement in a retaliation case).

**14.** Although *Turner* is a Title VII retaliation case, the anti-retaliation provision of Title VII and the ADA are almost identical and should be construed consistently. *Compare* 42 U.S.C. § 12203(a) ("[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]") *with* 42 U.S.C. § 2000e–3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].")

alleged disability. Thus, neither email constitutes protected activity because St. John could not have reasonably believed that Higginbotham's isolated disclosures of his personal information constituted an unlawful employment practice under the ADA. *See Turner*, 476 F.3d at 348 (plaintiff's request to supervisor not to use "ghetto children" remark and asking supervisor not to make reference to plaintiff's race, followed by email complaining about deteriorating work relationship with supervisor, with no reference to *discriminatory* conduct, was objectively unreasonable and did not constitute protected activity under Title VII). As such, St. John cannot establish his *prima facie* case of retaliation.

2. No causal connection exists between his complaints and his removal from the NCI engagement

■■■ To satisfy the "causal nexus" element at the *prima facie* stage St. John must demonstrate that the ultimate decisionmaker had knowledge of his protected activity.[15] *See Sherrod*, 132 F.3d at 1122. In this case, the sole decisionmaker, Powell, did not have knowledge of either the April 27 or May 9 "complaints" made internally at Sirius.[16] Moreover, St. John conceded in his deposition testimony that he did not have a viable retaliation claim against NCI:

Q.: Do you allege that NCI retaliated against you in any way?

A.: No.

Q.: So it's fair to say then that you do not have a claim for retaliation against NCI?

A.: That's fair.

(St. John Dep. at 238, Doc. 25 Ex. 1). Absent any claim against the decision-making entity, NCI, St. John does not have a viable claim against Sirius for his removal from the NCI project. Thus, St. John fails to establish any causal connection between his alleged protected activity and adverse employment action.

■■■ St. John argues that a "cat's paw" analysis applies to impute Higginbotham's alleged discriminatory and retaliatory animus to NCI and/or Sirius, thus repairing the causal connection between St. John's complaints and his removal from the NCI project. To invoke the "cat's paw" doctrine, a plaintiff must establish that both: (1) a co-worker exhibited discriminatory or retaliatory animus; and (2) the same co-worker possessed leverage or exerted influence over the formal decisionmaker. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir.2004). St. John has failed to establish either prong of the doctrine. First, there is no evidence that Higginbotham exhibited any sort of animus toward St. John. St. John makes the unsupported allegation that Higginbotham began a "campaign to get him terminated" once he confronted her in April about disclosing his sexual orientation to Lawrence, but the undisputed evidence demonstrates

---

15. The court assumes for this step in the analysis that St. John's complaints to Sirius regarding the disclosure of his personal information constitutes protected activity under the ADA. *But see,* Part III(C)(1), *supra*.

16. St. John speculates that Powell was aware of his complaints at Sirius because Higginbotham contacted NCI's in-house counsel following St. John's May 9 email to Daughtry. (*See* May 11, 2005 Higginbotham Email to Matt Thiem, Doc. 34 Ex. 22;

Higginbotham Dep. at 212–213, Doc. 34 Ex. 3). Neither Higginbotham's email nor her deposition testimony support the inference that she told NCI's in-house counsel that St. John had made an internal complaint at Sirius. Moreover, Powell did not consult with that counsel prior to making the reassignment request and was unaware that St. John had made a complaint at Sirius until after litigation ensued. (*See Powell Dep.* at 78–79, Doc. 25 Ex. 3).

that he failed to meet deadlines and exhibited problematic behaviors. Indeed, these facts are uncontroverted, and there is no basis in the record to support St. John's contention that Higginbotham lied about his performance and behavior in order to get him off the NCI project.[17] Second, St. John fails to produce any evidence that Higginbotham possessed authority or exerted a sufficient level of influence over Powell's decision to remove St. John from the NCI engagement. Higginbotham was a contract employee who, along with St. John himself, was required to provide status reports to Powell and others concerning Sirius's progress on the tax issues. Moreover, Powell emphatically denies that Higginbotham ever "recommended" that NCI request St. John's reassignment. (See Powell Dep. at 71–72, Doc. 25 Ex.3).[18] Accordingly, a "cat's paw" analysis fails to establish the causal connection element of St. John's *prima facie* case of retaliation.

All that remains of St. John's argument for the causal connection element is the temporal proximity of his May 9, 2005 email to Daughtry and the May 13, 2005 reassignment from NCI. Temporal proximity, standing alone, is insufficient to establish a causal connection in this case. Powell was completely unaware of his internal complaint to Sirius and there is simply no connection between her decision to remove St. John and St. John's April 27 and May 9 email.

██ Having failed to prove essential elements of his *prima facie* case, St. John cannot raise genuine issues of material fact regarding his claim of retaliation, and summary judgment is, therefore, appropriate. Finally, even if St. John had established a *prima facie* case, there is no evidence that "but for" his April 27 and May 9 emails, he would not have been taken off the NCI engagement. *See Strong v. Univ. Health-Care Sys.*, 482 F.3d 802, 806 (5th Cir.2007) (affirming that the "but for" causation standard applies at the pretext stage of a Title VII retaliation claim). The undisputed evidence supports the non-retaliatory reasons for NCI's decision to remove St. John from the engagement: he missed deadlines and billed an inordinate amount of G & A time, he yelled at Higginbotham in front of NCI employees and then stormed off the job, and Powell had decided, in any event, to move the tax function in-house and no longer use an outside consulting firm. St. John fails to demonstrate that any of these legitimate, non-retaliatory reasons for his removal were a pretext for retaliation. St. John is left with no evidence of retaliation save temporal proximity, which is insufficient alone to prove but for causation. *See id.* at 807–08.

## IV. CONCLUSION

Accordingly, and for all the reasons discussed above, it is hereby

---

17. The court also finds relevant the undisputed facts that Higginbotham and St. John had been friends for over a decade and that Higginbotham recommended that Chickering hire him as a Sirius employee to work on the NCI job assignment. Indeed, it makes no sense that Higginbotham, who knew about St. John's HIV-positive status, AA status, and sexual orientation, would suddenly harbor discriminatory animus less than three months after she had secured employment for St. John. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996) ("[C]laims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, 'it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.' ") (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)).

18. Plaintiff seriously misrepresents the record in this case when he contends that Powell "admitted" that Higginbotham recommended St. John's termination.

ORDERED that Defendants' motions (Docs. 25 and 29) are GRANTED.