# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50944

United States Court of Appeals
Fifth Circuit

**FILED**

August 10, 2015

Lyle W. Cayce
Clerk

NICOLE BURTON,

      Plaintiff - Appellant

v.

FREESCALE SEMICONDUCTOR, INCORPORATED; MANPOWER OF TEXAS, L.P.; MANPOWER, INCORPORATED; TRANSPERSONNEL, INCORPORATED,

      Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, OWEN, and HIGGINSON, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiff–Appellant Nicole Burton appeals the district court's grant of summary judgment in favor of Defendant–Appellees Freescale Semiconductor, Inc. ("Freescale"), Manpower of Texas, L.P., Manpower, Inc., and Transpersonnel, Inc. (collectively, "Manpower"). Burton brought a claim under the Americans with Disabilities Act (the "ADA") alleging discriminatory termination and a claim under the Texas Labor Code alleging retaliatory termination based on her filing of a workers' compensation claim. The district court ruled that the defendants had asserted legitimate reasons for

No. 14-50944

terminating Burton and that she failed to make an adequate showing that these reasons were pretextual.

Concluding that the evidence, viewed in Burton's favor, is sufficient to raise an inference of pretext, we reverse the district court's grant of summary judgment with respect to Burton's ADA claim. Burton's retaliation claim, however, fails as a matter of law because Freescale did not provide Burton's workers' compensation coverage and because there is no evidence that Manpower acted with a retaliatory motive.

## BACKGROUND

Freescale is a designer and manufacturer of microchips that relies, in part, on temporary employees provided by Manpower, a staffing agency. Beginning in 2009, Burton worked for Freescale as one such "temp" employee. (ROA.625–26.) In 2009 and 2010, Burton received generally positive-to-neutral performance reviews. (ROA.348–52.) In 2011, Burton's fortunes with Freescale turned. First, in January, she broke a wafer, the platform upon which microchips are seated during construction. (ROA.363.) The incident was reported and documented, and Burton received counselling from a Manpower supervisor, Jerry Rivera. (ROA.364, 442.) Then, on March 1, Burton inhaled chemical fumes while on the job. (ROA.147.) Nothing came of the incident initially, but on April 12, she reported chest pains at work and was ultimately attended to by the company medical department and then EMS. (ROA.391–92.) Due to heart palpitations, she visited the emergency room on May 9 and 17. (ROA.394–99.) In mid-June, Burton came to believe that her health condition was caused by the exposure to fumes. (ROA.367, 384–85, 689–91.) She notified Freescale and then, a day later, Manpower. (ROA.367, 154–55, 689–91) These reports effected the filing of a workers' compensation claim. (ROA.767.)

2

No. 14-50944

Roughly two weeks later, in "late June-ish," Freescale's Bruce Akroyd decided to terminate Burton. (ROA.134.) According to Akroyd, a June 28th incident where Burton was caught using the Internet represented the "final" straw.[1] (ROA.511.) Nonetheless, there is conflicting evidence on whether Akroyd actually knew about the Internet incident when he decided to terminate Burton and whether the Internet incident actually postdated the decision to terminate Burton. Akroyd did not directly supervise Burton and relied on reports of underlings in determining she should be terminated. (ROA.563.) It remains unclear how he reached his decision, when he reached his decision, and upon what basis he reached his decision.

While the decision to terminate Burton's assignment was made in late June, she was not terminated until late July. (ROA.323–24, 660.) The delay between the decision and its implementation was attributable to the need to hire and train her replacement. (ROA.526–27.) When the time to actually terminate Burton drew near, Manpower requested supporting documentation from Freescale. (ROA.339–40.) Akroyd passed the request to Freescale supervisors, who began generating retrospective "documentation" and (in contrast to previous practices) meticulously cataloging Burton's every shortcoming. (ROA.324, 338–39, 692; *see also* ROA.189.) On July 25, Manpower recommended against termination based on the paltry documentation and the recency of Burton's workers' compensation claim, but Freescale insisted. (ROA.615–16, 692–93.)

The next day, Rivera and Manpower's regional director Joleen Dorsey conducted a conference call with Freescale's Akroyd and HR representative Denise Chefchis to discuss Burton's firing and establish a "communication

---

[1] Burton asserts she was not using the Internet, but does not dispute that her Freescale supervisor genuinely believed she had been using the Internet.

plan." (ROA.323–24, 525.) Thereafter, Dorsey instructed Rivera to terminate Burton's assignment and to inform her it was based on four discrete incidents, at least two of which occurred after the decision to terminate her had already been made. (ROA.324.)

After her termination, Burton filed a claim with the EEOC, and Manpower and Freescale responded. (ROA.738–44.) The companies informed the EEOC that Burton was fired based on the four reasons previously provided to Burton at the time of her termination, this despite the fact that (at least) two of those reasons post-dated the actual termination decision.

Ultimately, Burton sued alleging her termination was discriminatory in violation of the ADA and retaliatory in violation of section 451.001(1) of the Texas Labor Code. The defendants moved separately for summary judgment, and judgment was granted in their favor. Burton now appeals.

## STANDARD OF REVIEW

"We review a district court's grant or denial of summary judgment *de novo*, applying the same standard as the district court." *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual "issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party," and "'material' if its resolution could affect the outcome of the action." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

## DISCUSSION

### I.

"The ADA prohibits an employer from discriminating against a 'qualified individual with a disability on the basis of that disability.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).

No. 14-50944

"When a plaintiff can offer only circumstantial evidence to prove a violation of the ADA, this court applies the *McDonnell Douglas* burden-shifting framework." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). Under this framework, the plaintiff must make a *prima facie* showing of discrimination. *Id.* Once the showing is made, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *See id.* The burden then shifts to the plaintiff to show the articulated reason is pretextual. *Id.*

## A.

This case requires us to go through each step of the *McDonnell Douglas* framework at some length. First, however, we consider the defendants' threshold arguments that they are not proper defendants. Freescale argues that it was not Burton's "employer" under the ADA, while Manpower argues it is not liable because Freescale was the driving force behind any discriminatory termination. These arguments fail.

## 1.

In determining whether Freescale was Burton's employer under the ADA it is appropriate to apply the "hybrid economic realities/common law control test."[2] *See Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117, 118–19 (5th Cir. 1993) (quoting *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990)). "The right to control an employee's conduct is the most important component of this test," and we consider "whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule." *Id.* at 119. "The

---

[2] *Deal* and *Fields* dealt with Title VII and the Age Discrimination in Employment Act rather than the ADA. Nevertheless, "[g]iven the substantial overlap in the analytical framework among the employment discrimination statutes," the test is applicable. *See St. John v. NCI Bldg. Sys., Inc.*, 537 F.Supp.2d 848, 859 (S.D. Tex. 2008).

No. 14-50944

economic realities component of our test has focused on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id.*

Freescale argues it is not Burton's employer because it did "not have authority to hire, fire, supervise or directly administer disciplinary procedures" to her. The evidence undermines this assertion. Freescale had the right to demand Burton's termination from the assignment. (ROA.237.) Freescale supervised Burton. Complaints against her were made by Freescale personnel, while her nominal Manpower supervisor, Arthur Flores, worked primarily at a different Freescale location and never observed her while she worked. (ROA.584.) Freescale employees completed performance reviews of Burton's work. (ROA.348–52.) On-the-job corrections and admonishment were delivered by Freescale employees. (ROA.338–39, 413–14.) Most fundamentally, it was Freescale that decided and insisted that Burton be fired. Burton has offered adequate evidence of an employment relationship.

With respect to the economic realities inquiry, Freescale asserts that it "does not handle payroll, withhold taxes, provided [*sic*] benefits, workers compensation insurance, or set the terms and conditions of employment for Manpower temps." These considerations favor Freescale, but on balance and cognizant of our mandate to "emphasize" the common law control test, we find they do not change the outcome. *See Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 434 (5th Cir. 2013). The competing tests are in equipoise, and our emphasis on the common law control test is dispositive.

2.

Manpower argues it cannot be liable for Burton's termination because Akroyd, a *Freescale* manager, made the actual decision to terminate her. This argument derives from our framing of the "right to control" inquiry: "which entity made the final decisions regarding employment matters relating to the

6

person claiming discrimination?" *Vance v. Union Planters Corp.*, 279 F.3d 295, 301 (5th Cir. 2002) (quoting *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999)).  Manpower has already admitted, however, that it was Burton's employer.  The "right to control" test is not implicated, and we will not misread *Vance* to mean, as Manpower argues, that in cases of joint employment only the individual decisionmaker's employer is the employer subject to liability under the ADA.

Manpower argues with more force that "merely being a 'joint employer' does not automatically impose liability for employment decisions under the ADA."  For this assertion, Manpower cites *Whitaker v. Milwaukee County*, a recent Seventh Circuit decision.  *See* 772 F.3d 802 (7th Cir. 2014).  We find *Whitaker* persuasive and agree with Manpower *as to the law*.

Other circuits "have held explicitly that establishing a 'joint employer' relationship does not create liability in the co-employer for actions taken by the other employer." *Whitaker*, 772 F.3d at 811 (citing *Torres–Negrón v. Merck & Co.*, 488 F.3d 34, 41 n.6 (1st Cir. 2007); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1244–45 (11th Cir. 1998).  In *Whitaker*, the Seventh Circuit agreed with the First and Eleventh Circuits as well as the EEOC that a joint employer must bear some responsibility for the discriminatory act to be liable for an ADA violation.  *See id.* at 812.  The relevant EEOC Enforcement Guide concludes as follows:[3]

> The [staffing] firm is liable if it participates in the client's discrimination. For example, if the firm honors its client's request to remove a worker from a job assignment for a discriminatory reason and replace him or her with an individual outside the worker's protected class, the firm is liable for the discriminatory

---

[3] We have repeatedly consulted the EEOC Compliance Manual when interpreting the ADA.  *See, e.g.*, *Chevron Phillips Chem. Co., LP*, 570 F.3d at 616; *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996).

discharge. The firm also is liable if it knew or should have known about the client's discrimination and failed to undertake prompt corrective measures within its control.

EEOC, No. 915.002, Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms, at 2260 (1997) (emphasis added).

Like the Seventh Circuit, "[w]e have no reason to depart from the course set by the other circuits and the view expressed by the agency charged with the administration of the statute."[4] *Whitaker*, 772 F.3d at 812. A staffing agency is liable for the discriminatory conduct of its joint-employer client if it participates in the discrimination, or if it knows or should have known of the client's discrimination but fails to take corrective measures within its control.[5] *See id.*

*Whitaker* involved joint employers—Milwaukee County and the State of Wisconsin's Department of Health Services. *Id.* at 803. Milwaukee County, however, "had no involvement in" the employment decisions underlying the plaintiff's claims and "no authority to override those decisions." *Id.* Ultimately, the Seventh Circuit found "nothing in the record suggests that the County

---

[4] We have held that Freescale and Manpower were joint employers and therefore have no occasion to consider whether they might be a single employer. In *Torres–Negrón*, the First Circuit found a triable issue as to whether Merck-PR and Merck-Mexico (both subsidiaries of Merck & Co.) were a single employer, meaning the illegal conduct of one could be imputed to the other. 488 F.3d at 41. In a footnote, the First Circuit expressly recognized, as we do today, that "a finding that two companies are an employee's 'joint employers' only affects each employer's liability to the employee for their *own* actions, not for each other's actions." *Id.* at 41 n.6. We have no occasion to adopt or disavow *Torres–Negrón* but note it is consistent with our holding.

[5] Citing *Vance*, Manpower urges us to hold that a staffing agency must be "instrumental" in making the decision to terminate the employee. We have already observed that *Vance* dealt only with the antecedent issue—whether a given defendant is an employer under the ADA. We again reject the invitation to misread *Vance* and instead hew to the rule adopted by the Seventh Circuit.

No. 14-50944

participated in the alleged discriminatory conduct or failed to take corrective measures within its control." *Id.* at 812.

*Whitaker* is distinguishable with respect to the facts that plainly matter. The undisputed evidence is that Manpower personnel carried out the actual termination. Further, Manpower terminated Burton's assignment after professing a belief that the termination was legally dubious. In an effort to address what Manpower's Dorsey labeled a "potential legal risk," Manpower participated in the creation and execution of a "communication plan" pursuant to which it could reasonably be inferred that both Burton and the EEOC were given false reasons for her termination. (ROA.189–90, 323–24.)

Manpower's argument that *contractually* it had "no choice but to comply" with Freescale's demand that Burton's assignment be terminated does not alter this analysis. First, a purported contractual obligation to fire an employee on a discriminatory basis is no defense. As an employer, Manpower had an independent obligation to comply with the ADA, and a contractual obligation to discriminate would be unenforceable.[6] *See Panasonic Co., Div. of Matsushita Elec. Corp. of Am. v. Zinn*, 903 F.2d 1039, 1041 (5th Cir. 1990). Second, under the contract, Manpower expressly agreed to follow all federal laws, "to comply with the Americans with Disabilities Act," and to ensure "workers assigned to perform services at Freescale are not deprived of any rights provided for under the ADA." This obligation to follow the law surely qualifies any obligation to end assignments at the will of the client.[7] *In re*

---

[6] The contract is to "be governed by and construed according" to Texas law. (ROA.231.)

[7] Recall that a staffing agency is liable for discriminatory conduct only if (1) it participated in the discrimination or (2) it knew or should have known about the client's discrimination and failed to undertake prompt corrective measures *within its control. See Whitaker*, 772 F.3d at 811–12. Thus, while Manpower's contract argument fails for the reasons given here, there are any number of scenarios in which the joint-employer client's unilateral action could violate the ADA but not trigger liability as to the staffing agency. This is not vicarious liability, and a staffing agency with no way of correcting or preventing its

No. 14-50944

*Velazquez*, 660 F.3d 893, 897 (5th Cir. 2011) ("When interpreting a contract, a court 'should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983))).

B.

We now consider whether Burton established a *prima facie* case of discrimination. Like the district court, we conclude that she carried her burden. Only Freescale argues otherwise.

To make out a *prima facie* case, a plaintiff in an ADA employment action must show:

> (a) she is disabled, has a record of having a disability, or is regarded as disabled, (b) she is qualified for her job, (c) she was subjected to an adverse employment action on account of her disability or the perception of her disability, and (d) she was replaced by or treated less favorably than non-disabled employees.

*Chevron Phillips Chem. Co., LP*, 570 F.3d at 615.

Here, the only issue is whether Burton was "regarded as" disabled by Freescale. She can prevail by establishing "she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "This 'whether or not' language was enacted as part of the ADA Amendments Act of 2008 [("ADAAA")]." *Mendoza v. City of Palacios*, 962 F. Supp. 2d 868, 871 (S.D. Tex. 2013). The ADAAA overrules prior authority "requiring a plaintiff to show that the employer regarded him or her as being substantially limited in a major life activity." *Dube v. Texas Health & Human Servs. Comm'n*, Case No. SA-11-CV-

---

client's discriminatory conduct will not be liable for an ADA violation. Here, we have found there are material fact issues with respect to Manpower's direct culpability.

No. 14-50944

354-XR, 2012 WL 2397566, at \*3 (W.D. Tex. June 25, 2012); *see also Neely v. PSEG Texas, Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013).

We have not yet determined what it means to be "regarded as" impaired under the ADAAA,[8] but section 12102(3)(A) is clear, as is its application here. Burton need only show that her "employer perceived [her] as having an impairment" and that it discriminated against her on that basis. *Mendoza*, 962 F.Supp.2d at 871. Freescale argues it was "not aware Burton had a disability." We find no shortage of contrary evidence.

A qualifying "impairment" includes "[a]ny physiological disorder or condition" that affects, among other body systems, respiratory and cardiovascular systems. *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 n.5 (5th Cir. 1995) (quoting 29 C.F.R. § 1630.2(h)). Freescale concedes "some evidence was raised showing that Akroyd was aware that Burton had received medical treatment." That is true and just begins to scratch the surface. Burton reported her job-related injury to Freescale personnel on June 11, 2011. (ROA.367.) In an e-mail dated the next day, she advised Freescale's Coy Clydene, "I got an ok from the [emergency room] to come back to work today, [but] I started having palpitations a few hours after we spoke." Akroyd testified he learned of Burton's alleged injury in mid-June and "immediately" instructed his staff to "look at it" because it was "important." (ROA.507.) A mid-June e-mail between Burton's supervisors entitled "Nicole Burton (absences)" discussing how to handle a pair of health-related absences backed

---

[8] In *Kemp v. Holder*, we held plaintiffs proceeding under the "regarded as" definition "must show either that '(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.'" 610 F.3d 231, 237 (5th Cir. 2010) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 2149–50 (1999)). The lawsuit in *Kemp* was filed prior to enactment of the ADAAA but we noted a "claim might fare differently if the ADAAA applied." *Id*. at 236.

No. 14-50944

by doctor's notes provides further evidence that Freescale had the knowledge necessary to regard Burton as impaired.

Then, when Freescale worked to compile "documentation" justifying its decision to terminate Burton, it collected multiple reports from supervisors explicitly tying complaints about Burton's conduct to her asserted medical needs.  (ROA.338–39.)   These e-mails extensively discuss Burton's health condition and reference her need "to sit down for a bit," "chest pains," and trouble breathing.   This evidence adequately establishes, at least at the summary judgment stage, that Freescale regarded Burton as disabled under the ADAAA.

C.

The burden shifts to Burton's employers to set forth a legitimate, nondiscriminatory reason for her termination.   "[T]o meet its burden of production under *McDonnell Douglas*, an employer must articulate a nondiscriminatory reason *with 'sufficient clarity'* to afford the employee a realistic opportunity to show that the reason is pretextual." *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S. Ct. 1089, 1095 (1981)).  We have repeatedly held that a charge of "poor work performance" is adequate when coupled with specific examples.  *See Feist v. Louisiana, Dep't of Justice, Office of Att'y Gen.*, 730 F.3d 450, 455 (5th Cir. 2013); *Medina v. Ramsey Steel Co. Inc.*, 238 F.3d 674, 684–85 (5th Cir. 2001);

Here, the charge is poor work performance.   In its brief, Freescale provides the following specific examples:

- In an October 2009 performance review, Burton received critical work assessments arguably amounting to evidence of poor work performance.
- A subsequent performance review indicating Burton had "snapped at" a trainer," and "tend[ed] to wander out of the work area."
- In January of 2011, Burton broke a wafer.

12

- On June 28, 2011, Burton used the Internet while at work.
- As reflected by Burton's final performance review and in e-mails dated in July, between April and June of 2011, Burton improperly leaned on workstations, failed to keep her nose covered, failed to escalate issues, and failed to proactively complete tasks absent direction.

We "are not to assess the employer's credibility or the truthfulness of its reason at this stage of the inquiry." *See Patrick*, 394 F.3d at 318. Nonetheless, we consider only pre-decision examples of alleged poor work performance. *See id.* at 318–20.

> As the ultimate issue is the employer's reasoning *at the moment* the questioned employment decision is made, a justification that *could not* have motivated the employer's decision is not evidence that tends to illuminate this ultimate issue and is therefore simply irrelevant at this stage of the inquiry. Especially in the context of this case—the employer's summary judgment motion to dismiss— such an offering is tantamount to offering no reason at all.

*Id.* at 319–20 (footnote omitted). In short, "after-acquired *knowledge*" cannot be the basis of the decision. *Id.* at 319 (emphasis added).

The parties argue over *Patrick*'s application to this case. Burton argues that, under *Patrick*, the charge of "poor performance" is a nonspecific statement that fails to discharge the defendants' burden under the *McDonnell Douglas* framework.[9] Freescale argues the case "has no application" at all.

Burton's argument is foreclosed by *Medina* and *Feist*, which found an allegation of poor work performance adequate where supported by specific examples. Freescale, however, is wrong to assert that *Patrick* does not apply. Under *Patrick*, we must discard any purported reasons for terminating Burton that the decisionmaker uncovered only *after* reaching the decision to terminate. *See id.* at 319–20. Thus, post-decision incidents are irrelevant, as are pre-decision incidents unknown to the decisionmaker at the time of the

---

[9] In *Patrick*, we rejected as "a rank generalization" an employer's vague explanation that the plaintiff was not "sufficiently suited" for a certain position. 394 F.3d at 317.

decision. *See id.* at 319 (rejecting an employer's attempt to "advance[e] after-acquired knowledge as a justification for its decision").

It is beyond dispute that Burton's initial performance reviews predated the decision to terminate her, and the broken wafer was also documented and known prior to the decision. Additionally, there is evidence Akroyd knew of Burton's unauthorized Internet use when he decided to fire her.[10] Indeed, he testified the incident represented the "final" straw.

There is no evidence, however, that the sundry additional complaints were known to Akroyd when he decided to fire Burton. The evidence shows these incidents were uncovered only after Akroyd took steps to retrospectively justify the termination decision. For example, Burton's first truly poor performance review (which included accusations that she had failed to cover her nose, failed to "take the initiative," "been found leaning on tools," and "sometimes leaves the area") was issued, at the earliest on June 29 but the evidence suggests it was not provided to Akroyd until July 26. (ROA.353–54, 754–56.) Similar accusations were first leveled in e-mails specifically solicited by Akroyd to provide "documentation" justifying his decision.

Freescale attempts to strengthen its position by arguing that the decision to terminate Burton "was reinforced by continuing performance issues while Burton's replacement was being trained, including Burton's failing to run a quality check and leaving her machine sitting." These incidents "*could not* have motivated" Akroyd's decision and are "simply irrelevant at this stage of the inquiry." *See Patrick*, 394 F.3d at 319. Rather, we "take a snapshot at

---

[10] Burton argues that Akroyd did not know of her alleged unauthorized use of the Internet until after he decided to fire her. At this stage of the inquiry, the employer bears "the burden of production, not persuasion," and the proffered reason is sufficient if supported by admissible evidence. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011). Below, we consider contrary evidence as part of the inquiry into whether the reason given for Burton's termination was pretextual.

No. 14-50944

the moment of the allegedly discriminatory act."[11] *See id.* at 319–20 (quoting *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 404 (1st Cir. 1990)).

Our reasoning comports with *Nasti v. CIBA Specialty Chemicals, Corp.*, a case involving two distinct decisions to terminate an employee. *See* 492 F.3d 589, 593–94 (5th Cir. 2007). In that case, the plaintiff's employer decided "in late 2003" that, based on performance issues, it would release her in January 2004. *Id.* at 592. "Between the time when [] management decided to terminate Nasti in late November 2003 and efforts to arrange a meeting with Nasti in January 2004," Nasti's supervisor conducted an investigation into a suspect expense report, concluded Nasti had submitted false documentation, and promptly fired her on that intervening basis. *Id.* Thus, discovery of the false report served as the basis for a subsequent "separate, independent decision[]"to terminate the employee, and we accepted the employer's assertion that it had fired Nasti for submitting a false report. *Id.* at 593–94.

Manpower argues that *Nasti* applies here, but there is no evidence of a "separate, independent" decision to fire Burton based on conduct occurring in July. There is evidence of *one* decision in late June. Incidents occurring after that single decision are irrelevant.

By asserting Burton was fired based on poor performance and citing specific examples predating the termination decision and known to the decisionmaker at the time of the decision, the defendants have managed to shift the burden back to Burton. Purported examples of post-decision poor

---

[11] Manpower goes to great lengths to explain what it dubs "Snapshot Theory" and argue that it is merely an "approach [that] makes sense in some cases." Manpower is incorrect. There is no doctrinally complex "theory" at play here. *Patrick* stands for the elementary proposition that, by definition, "reasons" must precede and influence the decision in question. An *ex post facto* reason is no reason at all.

performance, however, are not evidence of a legitimate, nondiscriminatory reason for her termination.

## D.

Burton must now "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 579 (internal quotations and citations omitted). "An explanation is false or unworthy of credence," and thus pretextual, "if it is not the real reason for the adverse employment action." *Id.* at 578.

An employee seeking to show pretext must rebut each discrete reason proffered by the employer. *See Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010). Here, the sole given reason is "poor performance." The *McDonnell Douglas* framework has fallen away, "and the issue becomes discrimination *vel non*." *Chevron Phillips Chem. Co., LP*, 570 F.3d at 615. We ask whether Burton's work performance was "the real reason" for her termination. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002).

We begin by revisiting the specific examples of poor performance set forth by Freescale and will then consider Burton's remaining arguments. *See Laxton*, 333 F.3d at 580 (first analyzing the employer's specific alleged justifications, then considering "other evidence that undermines the overall credibility of [the employer's] proffered justification").

### 1.

#### a.

**Performance Reviews.** According to Freescale, "in October 2009, Burton's Freescale manager reported Burton's poor performance to Manpower: Burton's 'attendance [was] below expectations,' and that '[e]arly in the year,

No. 14-50944

[Burton] was counseled for her poor communication with co-workers, she was not being cooperative and was not accepting responsibility for her performance.'" (Alterations in original.)   Freescale draws on a 2009 performance review for this evidence of poor performance and also relies on Burton's subsequent performance review, which repeats these same comments verbatim and adds the impressions of a new supervisor, Sharon Honerlah, who noted Burton "snapped at her trainer on one occasion" and "tend[s] to wander."[12]   Honerlah concluded she "would rate [Burton] on the border between Meeting and Below Expectations." (ROA.348.)

Freescale's reliance on these performance reviews is facially dubious. As an initial matter, we discard the reference to Burton's attendance; Burton was not fired for missing work. Further, the criticisms regarding Burton's attitude and communication are offset by the very next sentence of the review: "Since our dialogue she has made significant improvement in customer focus and communication with her co-workers." (ROA.352.)   Further, the reviews are arguably generally positive. The reviews state Burton "has great work ethic and desire to learn more," that she "frequently volunteers" for overtime, and that "[s]he is very flexible, able to move when needed." In the first review, Burton rated "Exceeds Expectations" on two categories and "Below Expectations" in only one—attendance, which again, is not the reason for her firing. In the second, she scored "Meets Expectations" in every category.

Further, it is hard to swallow Freescale's reliance on 2009 and 2010 performance reviews for a mid-2011 termination, especially considering that

---

[12] The actual dates of these performance reviews are unclear. In its brief, Freescale tells us that the initial review was conducted October, 2009 and that the second review covers "2010 and early 2011," but the evidence does not appear to support this latter claim. Honerlah's comments indicate that the review period did not span a calendar year: she references "Q3" and "10/30" and states her review is based on "4 weeks of performance." Even if the review period commenced October 30, it would extend only through November.

17

No. 14-50944

Burton was a temp. We do not doubt the relevance of a poor performance review, even if dated, but under these circumstances, a reasonable juror could certainly look askance at Freescale's contention that these performance reviews played any role in the determination to fire Burton. This is especially true given that no one at Freescale thought to supply Manpower with the reviews when it requested supporting documentation.

b.

**The Broken Wafer.** Freescale contends that it based its decision to fire Burton in part on the broken wafer. Burton points out that she worked an additional six months after the incident, meaning it was "clearly not a sufficient justification for her termination."

To the extent Freescale argues merely that the incident is some evidence of poor performance, we agree. Because the broken wafer was not proffered as an independent basis for termination, however, this single substantiated shortcoming does not doom Burton's endeavor to show pretext. *See Laxton*, 333 F.3d at 580 (commencing the pretext analysis by noting the plaintiff had admitted to a pair of company violations).

c.

**Unauthorized Use of the Internet.** Akroyd testified that Burton's unauthorized use of the Internet was the "final" straw. Burton concedes that her Freescale supervisor, Patricia Alvarez, genuinely believed she improperly used the Internet (although she testified she was not actually on the Internet). Thus, the dispute is not whether the incident happened or whether it violated company policy. The dispute is whether Burton's alleged use of the Internet was a "real reason" for her termination. *See Sandstad*, 309 F.3d at 899. If Akroyd did not actually know about the unauthorized Internet use at the time he decided to fire Burton (or if it had not even happened yet), it was not a true reason for her termination. *Patrick*, 394 F.3d at 319–20.

18

No. 14-50944

There is conflicting evidence with respect to Akroyd's knowledge at the time of his decision to terminate Burton, and we therefore conclude Burton has cast doubt on her employers' assertion that unauthorized Internet use was a reason for her termination.

Akroyd first testified that he did not know if Burton's unauthorized use of the Internet was "one of the things" that motivated his decision. (ROA.505.) He then testified, however, that he learned of the infraction from Alvarez, verbally, on the day he decided to terminate Burton. (ROA.511, 514–15.) Alvarez, however, testified that she never talked to Akroyd about Burton's performance. (ROA.554.) She also testified she did not know who made the recommendation to terminate Burton and did not participate in *any* conversation about terminating Burton's assignment. (ROA.543.) Following a break in the deposition, Alvarez then changed her testimony to say she in fact recommended Burton's termination—but that she believed she did so "slightly before" the June 28th Internet incident, and it was not to Akroyd at all but rather to one "Shawn Stroud," her "section manager."

*Gee v. Principi* is comparable. *See* 289 F.3d 342 (5th Cir. 2002). There, the plaintiff sought to show pretext by showing decisionmaker Lee Gibbs' "explanation for [the adverse employment action had] been disingenuous and inconsistent." *Id.* at 347. We relied on "discrepancies in Gibbs' own testimony," his shifting recollections, and conflicting testimony of other witnesses in reversing the district court's grant of summary judgment. *See id.* at 347–48.

Here, Alvarez and Akroyd have both told changing stories. Even after changing their stories, the testimony remains in conflict. Even Alvarez's corrected testimony, if credited, puts Akroyd's version of events into doubt. The stories are simply irreconcilable. In its brief, Freescale attempts to rehabilitate Akroyd's testimony but can do no better than to claim that "as the deposition progressed, it is undisputed that Akroyd's memory was refreshed

and he recalled and clarified that the Internet usage" was the final straw. Based on this record, a jury would be entitled to find that either Alvarez, Akroyd, or both lacked credibility. *See Laxton*, 333 F.3d at 582. Burton has "cast doubt on [Akroyd's] explanation, thereby enabling a reasonable factfinder to conclude that it was false."[13] *Gee*, 289 F.3d at 348.

Freescale objects to this parsing of testimony as "creative slicing and dicing."[14] The district court was in accord, reasoning that "[a] person cannot be expected to be able to recall every single detail from two-and-one-half years prior" and rejecting Burton's "attempts to pick apart each person's deposition testimony line by line." Similarly, the district court reconciled Alvarez's changing testimony by concluding that she changed it because "she wanted her testimony to reflect the correct answer."

This approach is inconsistent with fundamental rules governing summary judgment. By choosing which testimony to credit and which to discard, "the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986)). While utilization of the *McDonnell Douglas* framework requires fact-intensive analysis, it does not alter basic summary judgment law, which must control and restrain the inquiry.

---

[13] Freescale attempts to distinguish *Gee* by asserting "the Court in *Gee* noted [the] evidence of a glowing review given the plaintiff, which lauded her 'excellent communication skills,' and flexibility in accommodating others" and asserts "[n]o evidence of glowing performance reviews is raised by Burton." This purported distinction has nothing to do with the credibility of Freescale's witnesses. For what it is worth, we again note that Burton had reviews praising her "great work ethic and desire to learn more," stating she "frequently volunteers" for overtime, and that "[s]he is very flexible, able to move when needed." These excerpts are at least as glowing as the snippets quoted in *Gee*.

[14] Manpower argues, based entirely on its own parsing of Akroyd's deposition transcript, that there were no inconsistencies. This argument is better suited for a jury and entirely neglects Alvarez's testimony,

No. 14-50944

Freescale cites *Appelbaum v. Milwaukee Metropolitan Sewerage District*, a Seventh Circuit decision holding that "[o]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."  340 F.3d 573, 579 (7th Cir. 2003).  According to Freescale, this case involves no such shifting explanation because "the rationale for ending Burton's assignment has been consistent with every witness: poor performance."  Freescale also cites *Williams v. Columbus Metropolitan Housing Authority*, an unpublished Sixth Circuit case that rejected a plaintiff's attempt to show pretext through the inconsistent testimony of the defendant's witnesses where the cited inconsistencies had "no bearing" on the adverse employment decision.  90 Fed. App'x 870, 876–77 (6th Cir. 2004).

These cases have no application here.  We are not, at present, saying the inconsistency in and of itself raises an inference of pretext; we are saying that there is doubt Akroyd knew of Burton's Internet use when he made the termination decision.  If Akroyd had no such knowledge, proffer of the violation as a reason for her termination is false and therefore necessarily pretextual. *See Burrell*, 482 F.3d at 412.  Thus, unlike in *Williams*, the testimony here bears upon Akroyd's explanation for terminating Burton.  Burton has successfully raised a fact question regarding whether Akroyd knew of her alleged improper Internet use at the time he decided to fire her.

d.

**Post-Decision Additional Reasons.**  Consistent with Freescale's argument that post-decision events "reinforced" its decision to terminate Burton's assignment, Manpower argues that Burton's post-decision "continued poor performance after the decision was made, but before that decision was reviewed and re-confirmed, does not render the poor performance reason 'false.'"  Of course, any continued poor performance does not suggest pretext in

any way.  Evidence of a sudden and unprecedented campaign to document Burton's deficiencies and thus justify a decision that had already been made, however, could raise an inference of pretext.  *See Goudeau v. Nat'l Oilwell Varco, L.P.*, Case No. 14-20241, 2015 WL 4385621, at \*5 (5th Cir. July 16, 2015); *Laxton*, 333 F.3d at 582.

In *Goudeau*, a recent age discrimination case, we reversed a grant of summary judgment in favor of a defendant-employer where, among other things, the employer had neglected its own disciplinary policy.  *See* 2015 WL 4385621, at \*5.  We then then identified "evidence bear[ing] more directly on pretext than a failure to follow steps in a progressive discipline policy"—the plaintiff's contention "that the employer manufactured steps in the disciplinary policy by issuing written warnings to paper his file after it had decided to fire him."  *Id.*  In *Laxton*, we found evidence of discrimination sufficient where "the jury may have reasonably concluded that [Gap supervisors] solicited and exaggerated complaints from Laxton's assistant managers, issued a Written Warning and a Final Written Warning," and made "an effort to compile a laundry list of violations to justify a predetermined decision to terminate Laxton."  333 F.3d at 582.

Here, there is direct evidence that, after deciding to fire Burton, Freescale (with Manpower's participation) acted to create an exculpatory paper trail.  After Manpower's Rivera asked Akroyd for documentation supporting the decision to terminate Burton's assignment, Akroyd directly solicited Burton's supervisors to provide "documentation."  Alvarez responded with an e-mail that begins "Here is what I have on Nicole Burton" and sets forth "a laundry list of violations to justify [the] predetermined decision to terminate" Burton. *See id.*  Further, it appears Burton's only truly negative performance review was completed and submitted just *after* the decision to fire her and was

No. 14-50944

provided to Akroyd *after* he requested documentation. (ROA.338–39, 353–54, 754–56.)

Notwithstanding the fact that the requested "documentation" postdated the decision to terminate Burton, Manpower accepted it as adequate. Moreover, Manpower's Dorsey instructed Rivera to tell Burton she was being fired for breaking the wafer, unauthorized use of the Internet, and a pair of "protocol violation[s]" that occurred on July 19 and 25 respectively. (ROA.324.) Manpower thus relied on the retrospective laundry list of violations Freescale supervisors created at Akroyd's behest. A fair-minded juror could reasonably conclude this is evidence of pretext.

Indeed, the inference of pretext is stronger here than it was in *Laxton* and *Goudeau*. Here, (1) the defendants' e-mails show direct solicitation of belated "documentation" from Burton's supervisors, (2) there is evidence that Freescale had previously been lackadaisical about recording and reporting Burton's alleged deficiencies, and (3) the negative reports generated by the defendants were incorporated into a misleading "communication plan" regarding Burton's release.

### 2.

We now consider "evidence that undermines the overall credibility of [the defendants'] proffered justification." *See Laxton*, 333 F.3d at 580.

### a.

Burton argues that both defendants supplied the EEOC with a misleading explanation regarding her termination and that this constitutes evidence of pretext. We agree.

A jury may view "erroneous statements in [an] EEOC position statement" as "circumstantial evidence of discrimination." *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013). We have also found an employer's rationale "suspect" where it had "not remained the same" between the time of

No. 14-50944

the EEOC's investigation and the ultimate litigation.  See *Burrell*, 482 F.3d at 415.

According to Manpower's EEOC position statement:

The *reasons* for the termination of the assignment included the following:
- January 2011 – broken wafer
- June 28, 2011 – unauthorized use of internet
- July 19, 2011 – qualification of tools were not being performed
- July 25, 2011 – wafer boats were not balanced

(ROA.739 (emphasis added).)

According to Freescale's EEOC position statement, "Freescale asked that Ms. Burton, a demonstrably lower performer, be reassigned by Manpower *after* multiple incidents of poor performance in 2011, including improper handling of wafers in the fab, internet usage during work hours, and a misprocessing incident immediately before her release."  (ROA.744.)  (emphasis added.)

Freescale asserts the statements are not misleading because "Defendants found additional performance problems during the month it took to end [Burton's] assignment," which were added to the "list of performance deficiencies."  Manpower contends "the Defendants' EEOC position statements simply reflect the undisputed history of [Burton's] performance deficiencies." The district court found the post-decision events to be legitimate "additional" reasons for Burton's termination.

We have already observed that, as a matter of law, a purported reason for a decision that postdates the actual decision is necessarily illegitimate. *Patrick*, 394 F.3d at 318.  This is true as a matter of law but also as a matter of common sense.  A jury would be entitled to find the defendants' proffer to the EEOC disingenuous and evidence of pretext.  *See Miller*, 716 F.3d at 144. This is especially true given that the asserted post-decision reasons were potentially manufactured during the defendants' documentation collection

24

effort and especially true given that the letters were perhaps drafted in accordance with the "communication plan" settled upon by the defendants after identifying a "legal risk."[15]    (ROA.189, 323.)    Further, Freescale's statement to the EEOC that it requested Burton's termination "*after . . .* a misprocessing incident immediately before her release" is flatly untrue.

The stories being told to this court and to the EEOC are also inconsistent. *See Burrell*, 482 F.3d at 415.   Manpower and Freescale peddled Burton's alleged July deficiencies as reasons for her termination only before discovery uncovered the termination decision had been made in June.   Now, Burton's alleged failings in July are deemphasized and we are presented with dated performance reviews.   The shift is not dramatic but, given the circumstances, it is at least some evidence of pretext.

Freescale attempts to distinguish between inconsistent "reasons" and inconsistent "examples of continuous performance problems."   Specifically, Freescale argues:

> At no point has Freescale proffered any other reason for releasing Burton besides performance. [citation.]    And Burton cites no authority holding an employer must at all times recite the exact same examples of continuous performance problems—especially where the list is lengthy and on-going—in order to legally terminate an employee.

We do not hold that shifting "examples" of poor performances necessarily indicate pretext.   Where the "examples" first given have proven illegitimate, however, a jury could reasonably infer that the shift in explanation is significant.

---

[15] Given that the representations to the EEOC mimic Dorsey's instructions to Rivera regarding what he should tell Burton while terminating her assignment, and given that Dorsey's e-mails providing Rivera's script and noting the "communication plan" were sent within fifteen minutes of each other, such an inference would be reasonable.

No. 14-50944

For the reasons given and drawing all reasonable inferences in favor of the nonmovant, we cannot agree with the district court's conclusion that the defendants provided the EEOC with harmless "additional" reasons. The defendants provided the EEOC with purported "reasons" for Burton's termination postdating the decision to terminate her. This gives rise to an inference of pretext.

b.

Burton argues that the defendants' "failure to produce contemporaneous written documentation of performance problems is evidence of pretext" and, relatedly, that their "failure to follow protocol for reporting performance issues lends yet further support to the conclusion that Defendants invented a reason to terminate Ms. Burton." Freescale argues there is "no evidence" of a "policy stating that all performance deficiencies need to be documented" and contends "Burton rests her argument on generic testimony from witnesses that documentation is important and a good practice."

We do not know what the term "generic testimony" means,[16] but there is plainly evidence of a policy calling for prompt reporting and documentation of poor performance involving Manpower temps. Freescale's Akroyd testified that "the supervisor[s], if they have any type of concerns with performance or behaviors, they are to contact the Manpower supervisor. . . . [T]hey give that information to the Manpower supervisor, and the Manpower supervisor documents it." (ROA.512.) Manpower's Dorsey testified to the same effect and that it was Manpower policy to require such documentation. (ROA.612.) This

---

[16] Disparaging the evidence is a theme throughout Freescale's brief. In addition to labelling Burton's accounts of deposition testimony as "creative slicing and dicing" and writing off the testimony regarding the defendants' policies as "generic," Freescale also complained that "Burton attempts to pick apart verbiage used in Manpower's EEOC Position Statement." We do not find this sort of dismissive bluster compelling in the slightest.

uncontradicted testimony comes from the defendants' witnesses and is corroborated by documentary evidence. In a July 25 e-mail to Dorsey and other Manpower personnel, Rivera noted the lack of documentation relating to Burton's performance. (ROA.692.) In a July 26 e-mail "recapp[ing]" the defendants' conference call regarding Burton's "performance history," Dorsey stated she had "stress[ed] the importance" of reviewing "OEM"[17] reports promptly "so that performance issues can be identified immediately" and thanked the recipient (a Freescale employee) for "also encouraging timely feedback from Freescale supervisors to Manpower."[18]

In *Laxton*, we found a failure to produce "contemporaneous written documentation of any employee complaints, despite testimony that the corporation abides by rigorous record-keeping policies" created an inference that charges of employee complaints were false. 333 F.3d at 580. Similarly, in *Evans v. City of Houston*, we found a lack of documentation significant where testimony established that such documentation should exist and where the only evidence of an employee's "alleged 'checkered' employment history" consisted of internal memoranda drafted *after* the plaintiff "engaged in the protected activity and, indeed, after" the adverse employment decision. 246 F.3d 344, 355–56 (5th Cir. 2001).

Here, as in *Laxton* and *Evans*, we face a lack of contemporaneous documentation coupled with evidence that such documentation should exist.

---

[17] The acronym OEM appears to refer to the performance reviews completed by Freescale supervisors. (*See* ROA.520, 754.)

[18] When Burton broke a wafer in January of 2011, the incident was documented by Freescale and reported to Manpower. Manpower then counselled Burton, who never repeated the mistake. This incident appears to have been handled precisely as the evidence suggests each alleged incident should have been handled. Not only does it provide the employer with contemporaneous evidence of employee shortcomings, it also provides the employee with "the chance to explain her conduct or improve it." *Laxton*, 333 F.3d at 581.

As in *Evans*, such documentation was created after Burton came within the protections of the ADA and after the termination decision. Under the circumstances, this is additional circumstantial evidence of pretext.

According to Manpower, a lack of documentation is only probative of pretext where the employee challenges whether the incidents in question ever occurred. As Manpower argues, in *Laxton*, we relied on the suspicious lack of contemporaneous documentation in holding "that the jury could have reasonably found to be false" Gap's accusation that "employees lodged numerous complaints against Laxton." 333 F.3d at 580. We agree with Manpower to this limited extent: a lack of contemporaneous documentation, alone, is not evidence of pretext; the employee must also demonstrate why the absence of documentation matters. Otherwise, there would be no basis upon which a jury could infer pretext.

Here, the lack of documentation matters because the defendants charge Burton with a "history of performance problems" but can show only a pair of dated, neutral performance reviews, a single mistake, and (maybe) unauthorized use of the Internet. Their attempt to buttress the charge by compiling documentation after the fact only highlights the relevance of the absent documentation.

c.

Burton argues that "[t]he closeness in time of Ms. Burton's disclosure of her impairments to her termination is *also* evidence of pretext." (Emphasis added.) Freescale answers by claiming that "Burton asserts that temporal proximity *alone* allows her to survive summary judgment." (Emphasis added.) According to Manpower, "Burton is unable to cite a Fifth Circuit case holding that 'temporal proximity . . . is evidence of pretext' because that is not the law." The defendants have apparently misread Burton's arguments. Burton argues

that temporal proximity matters *because* she has adduced other significant evidence of pretext. We agree.

"Timing standing alone is not sufficient absent other evidence of pretext." *Boyd v. State Farm Ins. Cos.*, 158 F.3d 326, 330 (5th Cir. 1998). "'[T]he combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.'" *Evans*, 246 F.3d at 356 (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)).

We have already identified significant evidence of pretext, meaning the only issue now is whether the decision to terminate Burton's assignment was sufficiently close in time to the employer's perceived discovery of Burton's medical condition to raise an inference of pretext. Plainly so. The decision to terminate Burton was made in late June, roughly two weeks after Burton's mid-June formal report of her health problems.

Citing *Rogers v. Bromac Title Services, LLC*, 755 F.3d 347, 354 (5th Cir. 2014), Manpower further argues that "[w]hatever evidentiary force temporal proximity may have is eviscerated in cases where, as here, the adverse employment action is based on events which occur after the protected activity."[19] Manpower missteps here. We have been told by Freescale that Burton was fired for poor performance dating back to her 2009 performance review and continuing until her unauthorized Internet use—the final straw. Manpower mostly agrees and yet also repeatedly asserts that later events influenced the decision by "confirm[ing]" its propriety—this despite fervent

---

[19] *Rogers* does not stand for that stark proposition. The fallacy of the suggested rule is laid bare when one considers a typical race-based discrimination claim where the "protected" status is known at the time of hiring. According to Manpower's reading of *Rogers*, plaintiffs in such cases would never be able to point to temporal proximity as additional evidence of discrimination because proffered justifications for terminating or not promoting the plaintiff would, in every case, "occur after the protected activity." This is not the rule.

No. 14-50944

denials of any responsibility for the decision and despite Akroyd's testimony that later events did not influence his decision. Manpower's statement that Burton's termination was "based on events" occurring after her mid-June disclosure of work-related health problems is highly problematic because it is inconsistent with claims she was fired due to a long history of performance problems and for breaking the wafer in January. Only Burton's unauthorized use of the Internet corresponds with Manpower's new timeline. On this record, the assertion that Burton was fired "based on events" that occurred after her mid-June disclosure of health problems looks a lot like a shift in rationale constituting further evidence of pretext.[20] *See Burrell*, 482 F.3d at 415.

~~~

As we must, we have viewed the evidence in the light most favorable to Burton and drawn all reasonable inferences in her favor. Based on the foregoing survey of the evidence and in compliance with "the Supreme Court's mandate in *Reeves* not to substitute our judgment for that of the jury and not to unduly restrict a plaintiff's circumstantial case of discrimination," we conclude Burton has produced substantial evidence of pretext. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 n.4 (5th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097 (2000)).

## II.

Because the district court found insubstantial evidence that the reasons proffered by Manpower and Freescale for Burton's termination were pretextual, it granted summary judgment in their favor as to Burton's

---

[20] Manpower's version of the story—that the decision to fire Burton was reconfirmed (by who, we are not told) just prior to her termination based in part on incidents occurring in July—would, if supported by evidence, likely create a material factual dispute precluding summary judgment. There simply is no way to analyze the legitimacy of an employer's proffered reasons to terminate an employee if the basis of the decision is unclear, the timing of the decision is disputed, and the ultimate decisionmaker is unidentified.

retaliation claim based on section 451.001(1) of the Texas Labor Code ("Section 451.001"). Burton argues that her showing of pretext resurrects the claim. Similarly, Manpower wraps its Section 451.001 arguments into its pretext arguments. Freescale argues Burton failed to establish a *prima facie* case of retaliation and also that it is an improper defendant as a matter of law. We consider only the second argument.

### A.

Texas law prohibits discharge of employees based on the filing of a workers' compensation claim. Tex. Labor Code Ann. § 451.001(1). "[E]mployers that are nonsubscribers to the Texas Workers' Compensation Act" may not be sued under Section 451.001. *See Texas Mexican Ry. Co. v. Bouchet*, 963 S.W.2d 52, 53 (Tex. 1998).

Here, both defendants are, generally speaking, subscribers. Manpower provides workers' compensation for Burton and other temps (ROA.223–24), while Freescale provides the same for its permanent employees. The Texas Supreme Court has not ruled on whether a plaintiff–employee may bring a Section 451.001 retaliation claim against a joint employer that does not provide her workers' compensation coverage. Accordingly, we must make an *Erie* guess. "[O]ur job is to 'predict' how the court will rule." *McCaig v. Wells Fargo Bank (Texas), N.A.*, 788 F.3d 463, 472 (5th Cir. 2015).

The Texas Supreme Court has defined the scope of Section 451.001 by its intended protections. *See Bouchet*, 963 S.W.2d at 56 ("Because the Legislature stated article 8307c was intended to protect 'persons who bring Workmen's Compensation claims,' only subscribers can be subject to article 8307c claims." (analyzing and applying the predecessor statute to Section 451.001 and later noting the same conclusion would obtain under Section 451.001)). Thus, in *Bouchet*, the court held "nonsubscribers to the Texas Workers' Compensation Act" cannot be sued for an alleged violation. *Id.* at 53.

31

No. 14-50944

This holding, the court observed, was "consistent with our statement in *City of LaPorte v. Barfield*, 898 S.W.2d 288, 293 (Tex. 1995): 'Forbidding retaliation against an employee for seeking monetary benefits under the Worker's Compensation Law presupposes that the employer is a subscriber.'" *Id.* at 56.

Consistent with the rationale underlying *Bouchet* and by analogy to the term "employer," we conclude it is not enough to be a subscriber generally. Burton cannot bring a Section 451.001 retaliation claim against a defendant that did not provide her workers' compensation benefits.

In any given Workers' Compensation Act case, it is not enough that a plaintiff be an employee generally and a defendant be an employer generally; there must be an employer–employee relationship for these terms to take on meaning. *Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473, 476 (Tex. 2005). "[I]t is obvious that an employer of one or more employees is not the employer of *every* person who is an employee." *Id.* To borrow *Garza*'s illustration, "General Motors has more than one employee, but it is not the employer of Ford Motor Company employees, at least not as a general proposition." *Id.* Inquiries into whether a given defendant is an "employer" therefore include an individualized component—whether the defendant was an "employer" *of the plaintiff–employee.*

We predict the Texas Supreme Court would rule the same holds true with respect to the term "subscriber." Forbidding retaliation against an employee for seeking monetary benefits under the Workers' Compensation Act presupposes that the employer provides the employee's workers' compensation benefits and therefore has some stake in the claim. *Cf. Bouchet*, 963 S.W.2d at 56; *City of LaPorte*, 898 S.W.2d at 293.

32

No. 14-50944

Burton takes the position that as her "employer" and a workers' compensation subscriber, generally, Freescale is a proper defendant.[21] This approach ignores the rationale of *Bouchet*, the structure of the Workers' Compensation Act, and the purpose of Section 451.001.

The Workers' Compensation Act offers employers the choice of whether to provide workers' compensation insurance. *See Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 137–38 (Tex. 2003). By its structure, employers are "encourage[d]" to choose coverage. *See id.* at 142. For employers, the primary benefit of obtaining workers' compensation coverage is the promise of "immunity from suit for most work-related injuries." *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 206 (Tex. 2000). This immunity comes in the form of the Workers' Compensation Act's proviso that recovery of workers' compensation benefits "is the exclusive remedy" of employees "covered by workers' compensation insurance coverage." Tex. Labor Code Ann. § 408.001.

Consistent with this structure, the Texas Supreme Court has held that employers are only "covered by workers' compensation insurance coverage" for purposes of the exclusive remedy provision if their workers' compensation policy covers the injured plaintiff–employee. *Garza*, 161 S.W.3d at 481. In other words, to claim immunity from a plaintiff–employee's lawsuit, it is not

---

[21] "[I]n determining if a general employee of a temporary employment agency is also an employee of a client company for purposes of the Act, [Texas courts] consider traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury." *Garza*, 161 S.W.3d at 477. Further, "[t]he purposes underlying the Workers' Compensation Act and its definitions of 'employer' and 'employee' indicate that the general employer is, and should be, an 'employer' of a temporary worker even if a client company directs the details of that employee's work when the employee is injured." *Wingfoot Enters v. Alvarado*, 111 S.W.3d 134, 143 (Tex. 2003). The evidence supporting Burton's allegations of joint employment under the ADA also supports her claim that Manpower and Freescale were co-employers under the Workers' Compensation Act. But since Freescale is not the "*subscriber*" responsible for Burton's workers' compensation coverage, the question of employment is beside the point. *See Bouchet*, 963 S.W.2d at 56.

enough to point to coverage generally; the employer must show coverage *as to the injured plaintiff–employee.*

The purpose of Section 451.001 is "to protect persons entitled to benefits under the Workers' Compensation Act and to prevent them from being discharged for filing claims to collect those benefits." *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 312 (Tex. 1997) (per curiam); *see also Kerrville State Hosp. v. Fernandez*, 28 S.W.3d 1, 9 (Tex. 2000). The provision has no application where its purpose is not implicated—as where the defendant–employer is a nonsubscriber. *See Bouchet*, 963 S.W.2d at 56

Under Burton's approach, despite having no stake in Burton's workers' compensation claim, Freescale would be subject to liability because it made the unrelated and legislatively "encourage[d]" decision to provide coverage for its permanent employees. *See Wingfoot Enters.*, 111 S.W.3d at 142. Imposition of liability on this basis strikes us as purposeless and cuts against "the Act's decided bias in favor of employers electing to provide coverage for their employees." *See id.* at 140. Moreover, it is inconsistent with reasoning employed in multiple Texas Supreme Court cases including *Bouchet*, *Wingfoot*, and *Garza.* Freescale did not provide workers' compensation coverage for Burton and is not subject to her Section 451.001 retaliation claim.

B.

To recover under Section 451.001, "an employee must show that the employer's discriminatory action 'would not have occurred when it did had the worker's compensation claim not been filed.'" *Trevino v. Ramos*, 197 F.3d 777, 780 (5th Cir. 1999) (quoting *Stevens v. Nat'l Educ. Ctrs., Inc.*, 990 S.W.2d 374, 380 (Tex. Ct. App. 1999)). "This purely factual question centers on the employee's conduct and the employer's motivation." *Id.*

We have held that there is evidence that Manpower participated in the discriminatory termination of Burton, both by carrying out the actual

termination and by participating in any related cover-up.  That evidence, however, does not give rise to an inference that Burton was terminated *because she filed a workers' compensation claim*.  Here, the evidence is that Freescale was the driving force behind Burton's termination.  Manpower terminated Burton's assignment based on Akroyd's request and *in spite of* the workers' compensation claim.  Dorsey testified that she recommended a final warning instead of termination because it would give Burton a chance to improve and also "because of the time, the correlation to Ms. Burton's worker comp claim." (ROA.616.)   Contemporaneous e-mails between Freescale and Manpower officials corroborate this claim.  No evidence contradicts it.

Burton had "the burden of establishing a causal nexus between [her] filing of a workers' compensation claim and [her] discharge."  *Parham v. Carrier Corp.*, 9 F.3d 383, 386 (5th Cir. 1993).  She has not carried that burden, and summary judgment was properly granted with respect to the Section 451.001 retaliation claim.

## CONCLUSION

In conclusion, we agree with the retaliation judgment but disagree with the summary judgment of the ADA claim.  The judgment is REVERSED in part and AFFIRMED in part.  For further proceedings on the ADA claim, the case is REMANDED.