# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-10532

United States Court of Appeals
Fifth Circuit

**FILED**

June 15, 2020

Lyle W. Cayce
Clerk

ANDRE W. WILLIAMS, SR.,

      Plaintiff - Appellant

v.

WASTE MANAGEMENT, INCORPORATED; LOUIS RAMIREZ; LANCE BUTLER; MARK JOHNSON,

      Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:16-CV-02943-L-BN

Before BARKSDALE, HIGGINSON, and DUNCAN, Circuit Judges.

PER CURIAM:*

Remaining at issue—following a Federal Rule of Civil Procedure 12(c) judgment on the pleadings and a Rule 56 summary judgment—are three claims for discriminatory discharge based on: age, under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1); disability, under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a), and

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 19-10532

Rehabilitation Act (RA), 29 U.S.C. § 794(a); and race, under 42 U.S.C. § 1981(a).  AFFIRMED.

## I.

Waste Management, Inc. (WM), employed Andre W. Williams, Sr. (a black male, then age 50), initially in Oklahoma before his transfer to Texas.  In Texas, Williams worked on the "roll-off" line's (construction-site or industrial-site pickup) morning shift, beginning at 4:30; the evening shift began at 6:00.  WM also had a residential line, paying less than roll-off but with the shift's beginning at 6:00 a.m.

Williams stated in his deposition that he suffers from post-traumatic-stress disorder (PTSD) and takes sleep medication as a treatment (difficulty sleeping).  In mid-June 2013, Williams informed his then-supervisor, route-manager Short, that he felt his health had improved while WM had assigned him temporarily to a later start time.  Williams explained to Short that the 4:30 a.m. start time he ordinarily worked required him to take his medication earlier in the evening, sometimes leaving him insufficient time to complete errands and family obligations.  Williams had not previously discussed his medication with Short, who referred him to WM's contract medical provider.  Short also noted to Williams that he could switch to a residential shift beginning at 6:00 a.m.

Based on Williams' taking sleep medication, WM's contract medical provider temporarily disqualified him from work, pending his physician's confirming he could safely operate a commercial vehicle.  On 28 June, his physician did so and stated Williams could return without restrictions, provided he used his medication properly.

Williams, however, did not return to work.  Around 1 July, he instead telephoned defendant Mark Johnson—Short's replacement as his direct supervisor/route-manager.  Around 3 July, a meeting took place among

No. 19-10532

Williams, Johnson, and defendant Lance Butler (Johnson's supervisor). Williams stated in his deposition that, during the meeting, Johnson asked him whether he was too old to do his job, and Butler told him that he (Butler) did not care whether Williams remained employed at WM or went out and picked cotton. Williams also stated he had a follow-up telephone conversation with Johnson, during which Johnson again referred to Williams' being too old to do his job. Johnson and Butler deny these comments.

Williams further stated that, at an 11 July meeting attended by defendant Louis Ramirez, WM's area-human-resources (HR) director, Johnson again questioned whether Williams was too old to work at WM and stated black employees seek to avoid work. Johnson and Ramirez deny these comments were made.

Following email communications with Ramirez during the period 15–20 July, Williams was instructed to report to work at 4:30 a.m. on 22 July. Williams stated in his deposition that he did so at approximately 4:15 a.m. After checking his mailbox, which Johnson stated in his deposition probably lacked the materials Williams needed to clock in properly, Williams waited for Johnson for about 45 minutes. Williams never spoke with Johnson that day; and, because an unidentified person told him Johnson could not see him and to return later, he waited in his vehicle for approximately two hours. After returning to the office area and not finding Johnson, Williams stated in his deposition that he left a note for Johnson and went home.

Apart from leaving the note for Johnson, Williams did not communicate with either Johnson or TOPS (WM's third-party employment-records contractor) on 22–25 July, contrary to WM's policy, which required his communicating with both if he was going to be absent. (This note is not in the record; and, in his deposition, Williams did not describe the note's content beyond stating it was for Johnson.) Williams further stated that he did not

3

report on 23–25 July, or at any point after.  (In his testimony before the Oklahoma Unemployment Security Commission, included in WM's appendix supporting its summary-judgment motion, however, Williams stated:  he left the note for Johnson before he (Williams) waited in his vehicle; and he left around 5:00 a.m., after an unidentified person came out and told him Johnson "would not be able to get with me until a later time".)

After Johnson reported to Ramirez that Williams had failed to report on 22–24 July, WM determined he had voluntarily abandoned his job, pursuant to WM's objective "no call/no show" policy, explained *infra*.  WM contends this was an automatic outcome of Williams' having violated the policy for three consecutive days.  As noted, however, Johnson had to report this date-specific information to Ramirez before this determination was made.  Based on this summary-judgment evidence, we proceed on the basis that HR Director Ramirez was the ultimate decisionmaker regarding Williams' termination by WM on 24 July.

Williams filed an Equal Employment Opportunity Commission (EEOC) charge on 30 July, claiming only age and disability discrimination.  After receiving a right-to-sue letter, he filed this action against WM, Ramirez, Johnson, and Butler, proceeding *pro se* and claiming:  race discrimination, under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)(1)), as well as 42 U.S.C. § 1981(a); age discrimination, under the ADEA; disability discrimination, under the ADA and the RA; failure to accommodate, under the ADA and RA; and retaliation, under each of the five above-referenced statutes. (Williams is represented by counsel on appeal.)

Adopting a magistrate judge's (MJ) report and recommendations, to which Williams had not objected, the court granted a Rule 12(c) motion for judgment on the pleadings for the claims against the individual defendants, except the § 1981 claims.

No. 19-10532

Following a summary-judgment motion, the court adopted the MJ's report and recommendations, to which Williams had objected, and granted summary judgment for all defendants on all remaining claims. The MJ had recommended: for the Title VII race-discrimination claim and all retaliation claims, except for the one pursuant to § 1981, Williams failed to exhaust administrative remedies; for the § 1981 race-discrimination and retaliation claims, and for the ADA and RA disability-discrimination and failure-to-accommodate claims, Williams failed to show *prima facie* cases; and, for the ADEA claim, he failed to show pretext for discrimination. (Unlike the other statutes at issue, § 1981 does not require administrative exhaustion. *Scarlett v. Seaboard Coast Line R.R. Co.*, 676 F.2d 1043, 1050 (5th Cir. 1982)).

II.

On appeal (and, as noted, represented by counsel), Williams explicitly abandons his claims against the individual defendants. Because his opening brief discusses neither the ADA and RA failure-to-accommodate claims nor the § 1981 retaliation claim, he has also abandoned them. *E.g.*, *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) (citation omitted). Therefore, at issue are only Williams' challenges to summary judgment against his claims for discriminatory discharge under the ADEA, ADA, RA, and § 1981(a).

A summary judgment is reviewed *de novo. E.g.*, *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015) (citation omitted). "In doing so, we draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence." *Id.* (internal quotation marks and citation omitted). Under the familiar Rule 56 standard, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(a). "A disputed fact is material if it has the potential to affect the outcome of the suit under the governing law." *Garcia v.*

No. 19-10532

*Prof'l Contract Servs., Inc.*, 938 F.3d 236, 240 (5th Cir. 2019) (internal quotation marks and citation omitted). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 (5th Cir. 1999) (citation omitted).

A.

For his ADEA claim, Williams asserts: he established a *prima facie* case; WM did not proffer a legitimate, non-discriminatory reason for his termination; and, even assuming it did, that reason was pretextual. For the reasons that follow, Williams fails, however, to show a genuine dispute of material fact that WM's proffered reason was a pretext for discrimination.

To prevail for discriminatory discharge under the ADEA, plaintiff must prove "that age was the 'but-for' cause of the challenged employer decision". *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009) (citation omitted). A claim based on circumstantial evidence, as employed by Williams, "is evaluated under the burden-shifting framework first articulated in *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)] for Title VII claims of employment discrimination". *Goudeau*, 793 F.3d at 474 (citation omitted).

Under the burden-shifting framework, plaintiff must first establish a *prima facie* case that he was: discharged; qualified for the position; within the protected class when discharged; and replaced by someone younger or otherwise discharged because of his age. *Id.* (citation omitted). If he does so, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the termination". *Id.* (citation omitted). If the employer does so, the burden returns to plaintiff to "prove by a preponderance of the evidence that the [employer's proffered reasons] were not its true reasons, but were a pretext for discrimination". *Id.* (citation omitted). Although the *prima facie* case, "combined with sufficient evidence to find that the employer's asserted

justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated", *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), "[t]he issue at the pretext stage is whether [the employer's] reason, even if incorrect, was the real reason for [plaintiff's] termination", *Goudeau*, 793 F.3d at 476 (citation omitted). Restated, once the employer satisfies its burden, the presumption of discrimination "simply drops out of the picture", and plaintiff must "pro[ve] that the defendant intentionally discriminated against him because of his" age. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (alterations, internal quotation marks, and citations omitted).

## 1.

Regarding the *prima facie* case, WM maintains, as an alternative ground to affirm, that Williams was unqualified for the position because, it contends, he failed to report on 22 July, citing only *Munoz v. Seton HealthCare*, No. A-11-CA-151-LY, 2013 WL 1293425, at *11 (W.D. Tex. 26 Mar. 2013) ("[The employee's] failure to report to work rendered her unqualified for her position, and accordingly unable to meet her initial burden of establishing a *prima facie* case of discrimination under . . . the ADEA." (italics added) (citations omitted)), *aff'd on different grounds*, *Munoz v. Seton HealthCare, Inc.*, 557 F. App'x 314 (5th Cir. 2014). As did the district court (following the MJ's recommendation), we assume Williams has satisfied his *prima facie* burden and, therefore, do not reach whether any failure to report to work rendered him unqualified.

## 2.

As for WM's claimed legitimate, nondiscriminatory reason for Williams' termination, *see Goudeau*, 793 F.3d at 474 (citation omitted), Williams' contention that WM failed to make its minimal showing is incorrect. WM's memorandum supporting its summary-judgment motion contended the reason for termination was that "Williams voluntarily resigned his employment"

because he "was a no call/no show for three consecutive days"; but, as discussed *infra*, WM did not specify which three days.

WM did, however, contend "[t]he record evidence demonstrates, and Williams admits", that "Williams did not contact TOPS, his supervisors, or HR to report his absences from work on July 22, 23, or 24, 2013, or any day thereafter". (Emphasis omitted.) Nevertheless, this admission does not establish Williams violated the "no call/no show" policy on 22 July. Crediting his deposition testimony that he reported to work on 22 July, as we are required to do in evaluating a summary judgment because the parties genuinely dispute this (discussed *infra*), he would have had no reason to communicate to TOPS or his supervisors that he was going to be absent on that day.

3.

In support of Williams' ultimate burden of showing discrimination, he contends: he reported to work on 22 July; Johnson, his supervisor, made three ageist comments to him in the weeks preceding his termination; and these comments are relevant because Johnson made them in close temporal proximity to the termination and repeated them in a meeting with HR Director Ramirez, therefore making Ramirez aware of the comments and influencing the decision to terminate Williams. (Williams also claims WM has, between district court and our court, shifted its rationales for terminating him. In this instance, however, any such change is irrelevant because under review is the record established in district court.)

a.

Concerning WM's proffered reason for Williams' termination, the parties have been inconsistent about the three days WM used to justify Williams' termination. Williams' briefing contends 22 July was one of the three days,

but does not specify the other two. At oral argument before our court, however, he contended the relevant three days were 20–22 July.

For its part, WM contended in its memorandum supporting its summary-judgment motion that, "after Saturday, July 20th, Williams did not contact Johnson, Butler, Ramirez, TOPS, or anyone else at Waste Management". (Emphasis omitted.) Regarding Williams' claim to have reported to work on 22 July, WM countered in district court that he "did not clock in on July 22nd or otherwise attempt to report his alleged attendance, and [it] has no record of Williams reporting to work on July 22nd".

Although, as stated, WM also asserted in district court that Williams "voluntarily resigned his employment" because he "was a no call/no show for three consecutive days", WM did not specify the three days on which it relied in terminating him. Its briefing on appeal continues this vague formulation, adding that "Williams does not point to any evidence to refute [its] good-faith belief that he did not report to work on July 22nd as required". At oral argument, however, it contended, for the first time, that any fact issue as to 22 July was immaterial because he did not report on 23–25 July, or any day thereafter. ("For obvious reasons, we generally do *not* consider contentions raised for the first time at oral argument." *E.g.*, *Martinez v. Mukasey*, 519 F.3d 532, 545 (5th Cir. 2008) (emphasis in original).)

These inconsistencies notwithstanding, the record establishes that the three days on which WM relied to terminate Williams, pursuant to its "no call/no show" policy, were 22–24 July. That objective policy, as related by Ramirez' declaration, provides:

> If an employee is absent more than one day, the employee must notify [WM] "each and every day" of the absence by contacting [his] supervisor and TOPS. Failure to provide this daily notification will result in a "no call/no show" occurrence. Any employee who

9

No. 19-10532

incurs three consecutive no call/no show occurrences is considered by [WM] to have voluntarily terminated [his] employment.

(Emphasis omitted.)

Considering first Williams' proffered days (20–22 July), Ramirez' declaration stated he instructed Williams, on Thursday, 18 July, that Williams was required "to return to work on Monday, July 22, 2013[,] at 4:30 am". Williams acknowledged this by email. Saturday and Sunday, 20–21 July, therefore, were not days on which Williams was required to work. And, WM has never claimed that it relied on those days for Williams' termination, merely that it never had any communication with Williams *after* 20 July.

As for WM's claims, the record establishes it relied on 22–24 July to terminate Williams. Ramirez stated in his declaration, for example, that "[o]n July 22, 2013, Johnson informed me that Williams had not reported to work. Johnson informed me again on July 23 and 24 that Williams had not reported to work. These absences were designated as no call/no show occurrences under [WM's] policies". In his deposition, Ramirez further stated: he "believe[d] the effective [termination] date was July 24th or 25th"; and the days on which Williams did not report were "July 22nd, 23rd, and 24th".

WM's computer records corroborate these dates: an employment-tracking program stated Williams' date of termination was "07/24/2013"; Johnson received an automated email stating Williams had been terminated as of "2013-07-24"; and, on 25 July, Johnson initiated a requisition to fill Williams' position. Additionally, in response to Williams' Oklahoma unemployment claim, WM's third-party claims administrator listed Williams' date of separation as "07/24/2013". Although WM arguably would have had cause to terminate Williams for his failure to report on the days it relied upon at oral argument, 23 July *et seq.* (for which Williams does not contest that he violated the "no call/no show" policy), the record shows it did not do so. (Again,

10

No. 19-10532

our court does not generally consider assertions made initially at oral argument.  *E.g.*, *Martinez*, 519 F.3d at 545.)

b.

As stated, Williams does not contest that he violated the "no call/no show" policy on 23 and 24 July.  Therefore, whether WM's offered reason for terminating him was the real reason for termination depends on what occurred on 22 July, which the parties genuinely dispute.  In his deposition, Williams stated he:  reported to work around 4:15 a.m.; remained in the work area for approximately 45 minutes before someone told him Johnson could not see him; and waited in his car until around 7:00 a.m. before leaving a note for Johnson and departing.  (Again, the note is not in the summary-judgment record, and Williams' deposition testimony was simply that he left it for Johnson.  Nor does Williams' deposition, or any other part of the record, show WM ever received the note.)

Williams also attached to his opposition to the summary-judgment motion a KRONOS exception form (a document WM uses when employees cannot clock-in, which is to be signed by both the employee and the route manager) *that he alone signed*, stating he started work on 22 July at "4:30".  Johnson, by contrast, stated in his deposition:  he never saw any note from Williams; he does not recall Williams' having clocked-in or having completed a KRONOS exception form; and Williams never telephoned or emailed him on 22 July or any day thereafter.

Accordingly, the record shows a genuine dispute of fact for the events of 22 July.  (Regarding WM's brief's claiming the KRONOS exception form cannot be considered, we need not resolve this issue because Williams' testimony that he reported on 22 July suffices to show the parties genuinely dispute whether he did so.)

11

c.

Even so, that the employer's reason may have been incorrect does not *ipso facto* make it a pretext for discrimination; as stated, "[t]he issue at the pretext stage is whether [the employer's] reason, *even if incorrect*, was the *real reason* for [plaintiff's] termination". *Goudeau*, 793 F.3d at 476–77 (emphasis added) (citation omitted) (ruling doubts about defendant's reasons, "*combined with* the ageist comments[,] . . . would allow a [reasonable] jury to conclude that age was the reason for the termination" (emphasis added)). Along those lines, although "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit [a reasonable jury] to conclude that the employer unlawfully discriminated", "[t]his is not to say that such a showing . . . will *always* be adequate". *Reeves*, 530 U.S. at 148 (emphasis in original). Restated, "even where plaintiff provides some evidence of pretext, our court has held the overall lack of any evidence of discriminatory intent is sufficient to defeat plaintiff's claim". *Hervey v. Miss. Dep't of Educ.*, 404 F. App'x 865, 868 (5th Cir. 2010) (internal quotation marks and citations omitted); *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003) ("It is possible for a plaintiff's evidence to permit a tenuous inference of pretext and yet be insufficient to support a reasonable inference of discrimination." (internal quotation marks and citation omitted)).

It remains, of course, Williams' ultimate burden to show that, but for age discrimination, he would not have been terminated. *Goudeau*, 793 F.3d at 475 (citations omitted); *see, e.g.*, *St. Mary's Honor Ctr.*, 509 U.S. at 511. Whether Williams has established the requisite genuine dispute of *material* fact to overcome WM's motion for summary judgment requires analysis, therefore, of the ageist comments Williams stated Johnson made to him. For the following reasons, Williams fails to do so.

No. 19-10532

d.

"The value of such [ageist] remarks is dependent upon the content of the remarks and the speaker." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000) (citation omitted). In that regard, the comments are evidence of pretext for discrimination if they "show: (1) discriminatory animus (2) on the part of a person [who] is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker". *Squyres v. Heico Cos.*, 782 F.3d 224, 236 (5th Cir. 2015) (internal quotation marks and citations omitted).

Under this standard, discriminatory comments made by the person who terminates an employee (*i.e.*, the decisionmaker, or the individual "who actually made the decision or caused the decision to be made", *Russell*, 235 F.3d at 227) may, of course, show pretext for discrimination. *E.g.*, *Goudeau*, 793 F.3d at 476 (citations omitted). Again, so too may comments made by a non-decisionmaker whom "the employee can demonstrate . . . had influence or leverage over the official decisionmaker". *Russell*, 235 F.3d at 226–27 (citations omitted). That said, "sporadic" comments "untethered to specific speakers or times" do not show a genuine dispute of material fact as to the ultimate issue—whether defendant intentionally discriminated. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 442 (5th Cir. 2012).

Accordingly, a manager whose repeated comments exhibited discriminatory animus, but who did not formally terminate an employee, was held to be the "de facto decisionmaker" where he, *inter alia*, was the son of the parent corporation's CEO and received privileges other employees did not. *Russell*, 235 F.3d at 228. A terminating supervisor's comments referring to plaintiff as an "old fart[]" and wearing "old man clothes" also "easily" sufficed. *Goudeau*, 793 F.3d at 476 (citations omitted). By contrast, comments plaintiff "struggled" to attribute to particular coworkers, all of whom lacked any

"decision-making authority regarding his termination", were insufficient circumstantial evidence of discriminatory conduct. *Reed*, 701 F.3d at 438, 441–42.

In this instance, Williams asserts:  because Johnson made, according to Williams, his final ageist comment in Ramirez' presence (11 July), in close temporal proximity to Williams' termination (24 July), it is reasonable to infer that the remarks influenced the termination.  He has not contended, however, that Johnson was the primary decisionmaker.  Nor has he contended Ramirez' reliance on Johnson to provide the date-specific information underlying the termination shows Johnson's influence or leverage over Ramirez.  For its part, WM contends that, even if Johnson made the comments Williams attributes to him, they are insufficient because "Johnson was not responsible for Williams' termination".

Contrary to Williams' assertion, Ramirez' merely having been present when Johnson is alleged to have made the remark, without more, would not allow a reasonable jury to determine Johnson had the requisite influence or leverage over the decision to terminate Williams.  *See Gee v. Principi*, 289 F.3d 342, 347 & n.4 (5th Cir. 2002) (concluding decisionmaker's presence at meeting where harassing co-worker made derogatory comments about plaintiff established fact issue regarding influence, where other attendee testified plaintiff's fate was sealed at meeting).  Unlike *Russell*, on which Williams relies, Williams did not state in his deposition—nor does any other record evidence, including Johnson's and Ramirez' depositions, show—that Johnson had special privileges at WM or leverage over Ramirez.  *See Russell*, 235 F.3d at 227–28.  Williams' reliance on *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir. 1988), is, moreover, misplaced because the supervisors there, unlike Johnson, were "responsible for terminating" plaintiff. (Again, although Ramirez relied on Johnson to provide the date-specific

information underlying the termination, Williams' briefing does not contend this reliance constituted sufficient leverage or influence to infer the earlier alleged ageist remarks influenced the decision.)

B.

As stated, Williams has abandoned his ADA and RA retaliation claims. Concerning Williams' remaining ADA and RA discriminatory-discharge claims, which are considered together, *see Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (citation omitted), he contends:  he established a *prima facie* case; his difficulty sleeping constituted a "disability", as defined in 42 U.S.C. § 12102(1), as did his required sleep-medication's effect, in conjunction with his work schedule, on his eating habits; WM's reviewing his medical records demonstrates it regarded him as disabled; and he showed the requisite genuine dispute of material fact on pretext for discrimination because WM was aware of his difficulty sleeping, as well as its failure to document any performance issues before litigation.  He fails, however, to establish a *prima facie* case.

The ADA bars an employer from, *inter alia*, terminating a "qualified individual with a disability on the basis of that disability". *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (quoting 42 U.S.C. § 12112(a)).  Because Williams does not offer direct evidence of disability discrimination, he "proceed[s] under the burden-shifting analysis first articulated in *McDonnell Douglas* . . . .  This analysis first requires [Williams] to establish a *prima facie* case of discrimination" by showing he:  has a "disability", as defined by 42 U.S.C. § 12102(1); was qualified for the position; and "was subject to an adverse employment decision on account of his disability".   *Id.* at 694, 697 (italics added) (citations omitted).

Regarding the first element, that Williams has a statutorily-defined "disability", the ADA provides three standards:  "(A) a physical or mental impairment that substantially limits one or more major life activities of such

individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment". 42 U.S.C. § 12102(1). Williams claims he qualifies under subpart (C)'s "regarded[-]as" standard.

1.

It is unclear whether, on appeal, Williams also contends he qualifies under the standard articulated in subpart (A); he has, therefore, abandoned any such claim for failure to brief. *See, e.g.*, *Cinel*, 15 F.3d at 1345 ("A party who inadequately briefs an issue is considered to have abandoned the claim." (citation omitted)).

In any event, during his EEOC proceedings, he represented on his Intake Questionnaire that he had "[n]o disability but the organization treats me as if I am disabled"; and, along that line, he did not select the option marked "[y]es, I have a disability". He also represented to the Oklahoma Employment Security Commission (as part of his unemployment-benefits application) and the EEOC that he is not disabled. This was the basis for the district court's concluding (accepting the MJ's recommendation) that only 42 U.S.C. § 12102(1)(C) was in issue.

2.

To be disabled pursuant to the regarded-as standard articulated in 42 U.S.C. § 12102(1)(C), Williams must "establish[] that he . . . has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity". 42 U.S.C. § 12102(3)(A). In that regard, he "need only show that [WM] perceived [him] as having an impairment and that it discriminated against [him] on that basis". *Burton v.*

No. 19-10532

*Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015) (internal quotation marks and citation omitted).

Accordingly, an employer was held to have regarded an employee as disabled where the employer both:  was aware of the employee's having received medical treatment for a physical impairment; *and* justified termination by "collect[ing] multiple reports from supervisors explicitly tying complaints about [the employee's] conduct to [the employee's] asserted medical needs" and which "extensively discuss[ed] [the employee's] health condition", including her impairment symptoms. *Id.* at 230–31.  An employer who learned of an employee's physical impairment was also held to have regarded the employee as disabled where the employee's supervisor told the employee that the employer would be "in trouble" if the employee's "disability manifested again" on the job, and the terminating HR officer told the employee that she was terminated because of her disability.  *LHC Grp.*, 773 F.3d at 700–01.

WM was aware of Williams' medical condition (his difficulty sleeping) because, as discussed *supra*, it referred him to its contract medical provider to evaluate whether he could safely operate his commercial vehicle.  Williams, however, unlike plaintiffs in *Burton* and *LHC Group*, has adduced no evidence that WM "discriminated against [him] on that basis".  *See Burton*, 798 F.3d at 230 (citation omitted); *LHC Grp.*, 773 F.3d at 700–01.

The record instead reflects that, after he was cleared, on 28 June, to return to work with no restrictions, WM attempted to return him to his same position, with no changes to his responsibilities or salary.  The reason that he did not return to this same position was his decision not to report to work, attempting instead to renegotiate the terms of his employment, seeking, *inter alia*, a later start time and an automatic-transmission vehicle.  WM attempted to satisfy him by offering him a transfer to the residential line, which had a later start time, but lower pay; Williams, however, rejected this offer.

17

And, unlike his ADEA claim, Williams does not contend that anyone at WM made any derogatory comments about any actual or perceived physical or mental impairment. (Regarding WM's contention that Williams was not qualified for the position: Williams has not established a *prima facie* ADA case for the stated reasons; therefore, as discussed regarding his ADEA *prima facie* case, we need not decide Williams' qualification *vel non*.)

C.

Section 1981, passed as part of the Civil Rights Act of 1866 "to vindicate the rights of former slaves" and amended in the Civil Rights Act of 1991 to clarify it applies to private discrimination and define its terms, provides a remedy for racial discrimination in contracting, including termination of employment. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015, 1018–19 (2020). Although similar in some respects to Title VII, 42 U.S.C. § 1981 requires plaintiff's showing but-for causation, *id.* at 1014, and, as noted, lacks an exhaustion requirement, *Scarlett*, 676 F.2d at 1050.

As stated, Williams has abandoned his § 1981(a) retaliation claim. As for his § 1981(a) race-discrimination claim, after listing the requisite elements, his brief contends only as follows (and, his reply brief does not address § 1981):

> In this case, it is undisputed that Appellant is an African American, and therefore, a member of a racial minority. In terms of intentional discrimination on the basis of race, the record is replete with examples where Williams was subjected to express verbal harassment on the basis of race. [record citation to complaint's allegations] Specifically, Williams testified that comments were made denigrating and disrespectful to African Americans. Accordingly, Appellant satisfied his burden of proving an issue of fact as to whether he was intentionally discriminated against based on race.

Such minimal briefing is insufficient to present a claim on appeal. *See, e.g., Cinel*, 15 F.3d at 1345 (citation omitted). By simply "listing" this claim without "offer[ing] [any] further arguments or explanation", Williams has

waived it for failure to brief.  *See United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (citations omitted).

In any event, Williams fails to establish the requisite *prima facie* case because his above-quoted cursory recitation does not show the element that he "was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group".  *See Morris v. Town of Independence*, 827 F.3d 396, 400–01 (5th Cir. 2016) (citations omitted) (concluding plaintiff failed to state *prima facie* § 1981 case where proffered comparator had different job responsibilities).

### III.

For the foregoing reasons, the judgment is AFFIRMED.